153 F.3d 134
 22 Employee Benefits Cas. 1545,
Pens. Plan Guide (CCH) P 23944W
 Marc E. LeBLANC, Administrator of the Sheet Metal Workers'
National Pension Fund; Sheet Metal Workers' National
Pension Fund; John Harrington, in his capacity as a
participant in the Sheet Metal Workers' National Pension
Fund, 15 Garden Drive, Lynbrook, NY 11563; Arthur Moore, in
his capacity as Trustee of the Sheet Metal Workers' National
Pension Fund; Alan J. Chermak, in his capacity as National
Pension Fund Trustee; Matthew B. Hernandez, Jr., in his
capacity as National Pension Fund Trustee; Clinton O.
Gowan, Jr., in his capacity as National Pension Fund
Trustee; Ronald Palmerick, in his capacity as National
Pension Fund Trustee; Bruce Stockwell, in his capacity as
National Pension Fund Trustee, Plaintiffs-Appellants,
v.
Lawrence A. CAHILL; Kenneth M. Cahill; James W. Beck;
Charles E. Underbrink; Larken, Incorporated;
Larken Properties, Incorporated,
Defendants-Appellees,
and
Edward Williams; Oakleigh J. Thorne; Thorne Consultants,
Incorporated; Rick Mandrell; Edward J. Carlough; Gordon
Jones; Cavet Snyder; June M. Carlough, in her capacity as
the Administratrix of the Estate of Edward J. Carlough;
Judith L. Boyce Jones, in her capacity as representative of
the estate of Gordon Jones, Defendants.
Secretary of Labor, Amicus Curiae.
Mark E. LeBLANC, Administrator of the Sheet Metal Workers'
National Pension Fund; Sheet Metal Workers' National
Pension Fund; John Harrington, in his capacity as a
participant in the Sheet Metal Workers' National Pension
Fund, 15 Garden Drive, Lynbrook, NY 11563, Plaintiffs-Appellants,
and
Arthur Moore, in his capacity as Trustee of the Sheet Metal
Workers' National Pension Fund; Alan J. Chermak, in his
capacity as National Pension Fund Trustee; Matthew B.
Hernandez, Jr., in his capacity as National Pension Fund
Trustee; Clinton O. Gowan, Jr., in his capacity as National
Pension Fund Trustee; Ronald Palmerick, in his capacity as
National Pension Fund Trustee; Bruce Stockwell, in his
capacity as National Pension Fund Trustee, Plaintiffs,
v.
Lawrence A. CAHILL; Kenneth M. Cahill; James W. Beck;
Charles E. Underbrink; Larken, Incorporated;
Larken Properties, Incorporated,
Defendants-Appellees,
Popham, Haik, Schnobrich & Kaufman, Limited, (as to Larken
defendants proposed fees and costs), Intervenor-Appellee,
and
Oakleigh J. Thorne, Thorne Consultants, Incorporated; Rick
Mandrell; Gordon Jones; Cavet Snyder; June M. Carlough,
in her capacity as the Administratrix of the estate of
Edward J. Carlough, Defendants.
Secretary of Labor, Amicus Curiae.
 
 Nos. 96-2046, 96-2848.
 United States Court of Appeals,
Fourth Circuit.
 Argued May 6, 1998.
Decided Aug. 11, 1998.
 ARGUED: John O'Brien Clarke, Jr., Highsaw, Mahoney & Clarke, P.C., Washington, D.C., for Appellants. Elizabeth Hopkins, United States Department of Labor, Washington, D.C., for Amicus Curiae. Mark Fox Evens, Reid & Priest, L.L.P., Washington, D.C.; Thomas William Pahl, Kelly & Berens, P.A., Minneapolis, Minnesota, for Appellees. ON BRIEF: L. Pat Wynns, Melissa B. Kirgis, Highsaw, Mahoney & Clarke, P.C., Washington, D.C., for Appellants. J. Davitt McAteer, Acting Solicitor of Labor, Allen H. Feldman, Associate Solicitor for Special Appellate and Supreme Court Litigation, United States Department of Labor, Washington, D.C., for Amicus Curiae. Christopher Connolly, Brendan M. Donnell, Jr., Reid & Priest, L.L.P., Washington, D.C.; Timothy D. Kelly, Kelly & Berens, P.A., Minneapolis, Minnesota; Craig C. Reilly, Richards, McGettigan, Reilly & West, P.C., Alexandria, Virginia, for Appellees.
 Before MURNAGHAN and HAMILTON, Circuit Judges, and MICHAEL, Senior United States District Judge for the Western District of Virginia, sitting by designation.
 Affirmed in part, vacated in part, and remanded by published opinion. Judge HAMILTON wrote the opinion, in which Judge MURNAGHAN and Senior Judge MICHAEL joined.
 OPINION
 HAMILTON, Circuit Judge:
 
 
 1
 In this appeal, we decide three issues of first impression in our circuit under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001-1461. The first issue is whether ERISA § 514(a), 29 U.S.C. § 1144(a), which provides that ERISA "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan ...," preempts a state common law cause of action for fraud, pressed by a pension plan subject to ERISA, against a third party who is neither a fiduciary nor a party in interest with respect to the plan, but who allegedly fraudulently induced the pension plan to enter into a risky investment deal. We hold that ERISA § 514(a) does not preempt such a cause of action. The second issue is whether ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), which provides, in pertinent part, that "[a] civil action may be brought--... (3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of [ERISA] or the terms of the plan, or (B) to obtain other equitable relief (i) to redress such violations or (ii) to enforce any provisions of [ERISA] or the terms of the plan ...," provides a cause of action for appropriate equitable relief against a nonfiduciary, nonparty in interest, whose interests are adverse to the interests of a pension plan subject to ERISA, and who knowingly participated in a transaction prohibited by ERISA § 406(b)(2), 29 U.S.C. § 1106(b)(2). On this issue, we hold that ERISA § 502(a)(3) provides such a cause of action. The third issue is closely related to the second and asks whether ERISA § 502(a)(3) provides a cause of action for appropriate equitable relief against a nonfiduciary, nonparty in interest who knowingly gave a plan fiduciary consideration in connection with a transaction involving assets of the plan--a transaction prohibited by ERISA § 406(b)(3), 29 U.S.C. § 1106(b)(3). On this issue, we hold that ERISA § 502(a)(3) provides such a cause of action.
 
 I.
 
 2
 Appellant Sheet Metal Workers' National Pension Fund (the Pension Fund) is a multi-employer employee pension benefit plan, subject to regulation under ERISA. The Pension Fund is located in Alexandria, Virginia, and in 1989, it had over $1.5 billion in assets. At all times relevant to this appeal, Raymond Sweeney served as the Pension Fund's general legal counsel.
 
 
 3
 In January 1989, the Pension Fund hired Edward Williams to manage its direct investment portfolio and to develop direct investment strategies consistent with the objectives of the Pension Fund. Edward Williams provided investment advice to the Board of Trustees of the Pension Fund (the Former Trustees) on a regular basis until he left the Pension Fund's employ in mid-1990. Edward Williams worked closely with Edward Carlough, Chairman of the Board of Trustees and General President of the Sheet Metal Workers' International Association, the Pension Fund's affiliated union.
 
 
 4
 Appellee Larken, Inc. is an Iowa corporation engaged in the business of managing hotel properties and has its principal place of business in Cedar Rapids, Iowa. Larken, Inc. owned many of the hotels that it managed. In 1989, most of the hotels managed by Larken, Inc. were under the Holiday Inn flag. Larken, Inc. is wholly owned by two brothers, Lawrence and Kenneth Cahill, both residents of Iowa.
 
 
 5
 In 1986, James Beck and Charles Underbrink, both residents of Minnesota, agreed to act as investment bankers for Larken, Inc. and the Cahills. In November 1987, James Beck and Charles Underbrink successfully arranged for a $60,750,000 mortgage due and payable in 1994 to refinance approximately $40,000,000 of debt on seventeen of the Holiday Inns owned by Larken, Inc. Those seventeen mortgaged hotels along with four other hotels carrying $5,600,000 in debt were offered to over 100 potential investors in 1988 through mid-1989 with the expectation of obtaining $40,000,000 by dividing the equity in the twenty-one hotels portfolio into $20,000,000 of equity and $20,000,000 in debt placements. Only a few potential investors expressed any interest in investing in this package.
 
 
 6
 In March 1989, Larken, Inc. had placed those twenty-one hotels into a limited partnership known as Larken Hotels Limited Partnership (LHLP). Larken, Inc. was the limited partner in LHLP, owning ninety-nine percent of the equity. A related corporation, Larken Properties, Inc. (LPI), was the general partner in LHLP and initially owned the remaining one percent. At all times relevant to this case, the Cahill brothers along with Charles Underbrink and James Beck were officers, directors and principal shareholders of LPI.
 
 A. LHLP Investment Proposal
 
 7
 In late July 1989, James Beck approached Edward Williams about investing in the LHLP package that had been offered to the over 100 other potential investors. Beck also mentioned the possibility of the Pension Fund further investing in between ten and twenty hotels currently owned by insurance companies that needed asbestos abatement work. In a memorandum dated August 4, 1989, Edward Williams brought both investment possibilities to Chairman Carlough's attention and added that his "initial thought" was to "find[ ] a way to joint venture the hotels with their existing owners, get Cahill in the hotels as the operator/manager, have Beck help structure the transaction, and [our union] will do all the abatement and renovation work." (J.A. 1680). Edward Williams knew that Chairman Carlough wanted the union to perform asbestos abatement work and wanted the Pension Fund to invest in companies that performed such work. On August 10, 1989, Chairman Carlough replied by letter to Edward Williams' memorandum of August 4, 1989, stating that the first proposal did not excite him but that the second one, the one involving asbestos removal, "looks like something we ought to assiduously pursue." (J.A. 1357).
 
 
 8
 On August 8, 1989, James Beck wrote Edward Williams, combining the two investment proposals. According to James Beck, the "idea to put together an operating partnership where you would supply the capital and the expertise to remove the asbestos and we would negotiate for the purchase of the properties, market and manage the facilities makes an enormous amount of sense." (J.A. 1681). James Beck proposed that the Pension Fund invest $20 million in LHLP to "create the vehicle by which additional properties could be acquired and operated." Id. On August 21, 1989, Edward Williams informed Chairman Carlough that he was "extremely excited about the possibilities the [revised] hotel deal offer[ed]" and recommended that the Pension Fund "proceed with due diligence on this investment as soon as possible." (J.A. 1688-89).
 
 
 9
 In October 1989, Edward Williams assembled a due diligence team to evaluate the revised LHLP investment proposal, consisting of himself, outside legal counsel (the law firm of Rogovin, Huge, and Schiller), an engineer knowledgeable in financial matters (Rick Mandrell), a real estate consultant (Oakleigh Thorne), and an environmental consultant (Mitchell DeCuir). While the due diligence team was investigating the revised LHLP investment proposal, James Beck met with Edward Williams on October 24, 1989, at which time they discussed "a structure that would take the 21 Hotel transactions and add at least another 10 hotels or more by raising enough equity from other pension funds to increase the total pool as well as set in motion a business plan that would allow for the acquisition of several new hotels a year." (J.A. 1713). James Beck proposed that Edward Williams, with Charles Underbrink's assistance, establish an entity named the "Ed Williams Group." Under the auspices of this entity, Edward Williams would provide due diligence reports to other pension funds on investments that James Beck would propose and receive certain fees for that conduct. LPI would receive fees for putting the deal together and maintaining the newly formed partnership. In accord with James Beck's proposal, Edward Williams subsequently formed the "Ed Williams Group." Edward Williams and James Beck then conducted the business arrangement as proposed by James Beck in November 1991 with the Ed Williams Group receiving over $800,000 in fees between October 1990 and November 1991.
 
 
 10
 Once assembled, the due diligence team requested appraisals of the twenty-one hotels. In response to this request, LPI hired American Appraisal Associates (AAA) to perform desk top appraisals of the twenty-one hotels. AAA had previously appraised the hotels in 1987 and 1988. From the beginning, AAA and LPI agreed that in preparing the appraisals AAA would rely on financial data and market survey results provided by Larken, Inc.'s representatives and LPI without verifying that information.
 
 
 11
 AAA completed the appraisals of nine of the twenty-one hotels in mid-November 1989, and the remaining twelve hotels in late November 1989. On several occasions during this period of time, James Berman, an employee of LPI, met with Lawrence Nicholson in an attempt to secure favorable appraisals of the twenty-one hotels. Specifically, James Berman concentrated on AAA's cash flow projections for each hotel. When favorable to his position, James Berman used Larken, Inc.'s internal operating budgets to argue that AAA had underestimated the cash flow of certain hotels. Conversely, James Berman did not bring to Nicholson's attention instances where Larken, Inc.'s internal operating budgets were lower than AAA's projected cash flow. As a result of James Berman's meetings with Lawrence Nicholson, AAA increased the appraised values of fourteen of the hotels by a total of over $14 million. AAA subsequently sent its final appraisals of the twenty-one hotels to the due diligence team, which questioned whether AAA's projections of net operating income were realistic. In this regard, Edward Williams asked James Beck to explain why net operating income appeared to be flat historically, but was projected to increase in 1994. In response to this conversation, James Beck sent a letter to Edward Williams on December 8, 1989, in which he misrepresented that the forecasts for 1990 and after "are not our forecasts, but were generated by American Appraisal Associates based on their independent analysis of each of the 21 hotels." (J.A. 1031).
 
 
 12
 The due diligence team included the AAA appraisals as part of its December 1989 report to the Former Trustees, known as the Thorne Report, specifically commenting that the team "accepted the projections submitted by AAA as being probable" with certain minor exceptions at three hotels. (J.A. 1562). The report also stated that:
 
 
 13
 We also investigated and asked for explanations of those projections illustrating a significant variance from historic actual performance. Members of the Larken group and AAA have been responsive to our questions and pointed to circumstances in the market that logically explain these changes in house profits.
 
 
 14
 (J.A. 1562-63).
 
 
 15
 When the LHLP investment proposal was presented to the Former Trustees on December 12, 1989, Former Trustee Richard Dominico questioned the prudence of investing in hotels, especially these twenty-one hotels because of their age and locations. As a result of Former Trustee Dominico's opposition, the Former Trustees directed Pension Fund General Counsel Raymond Sweeney "to retain a firm with experience in the hospitality industry for the purpose of reviewing the underlying assumptions upon which the proposed transaction is based and providing the [Former] Trustees with a written report regarding the reasonableness of those assumptions." (J.A. 1535). Raymond Sweeney in turn hired Arthur Andersen & Co., Inc., specifically its consulting arm in the field of hospitality (Arthur Andersen), to perform the review and forwarded to Arthur Andersen the Thorne Report, the AAA appraisals, historical information from Larken, Inc. and LPI, and internal memoranda from Larken, Inc.
 
 
 16
 Following its review of a package of LHLP investment materials provided by the due diligence team, on December 20, 1989, Arthur Andersen participated in a telephone conference with some of the due diligence team members. During that conversation, Arthur Andersen opined that the LHLP investment proposal was so risky the Pension Fund would be wasting its money by spending any additional time reviewing the package. Arthur Andersen explained that the twenty-one hotels were "not investment-grade properties--they [we]re old [h]otels with short remaining economic lives and high risks." (J.A. 598). Moreover, Arthur Andersen stated that "[t]here is little likelihood that the value of these [h]otels will increase over the next five years, and a high likelihood that the values will decline in the future." Id. Finally, Arthur Andersen emphasized that the appraisals were deficient in that they did not contain any rationale for their projections of growth in hotel demand, their projections of improvement in the twenty-one hotels' share of the market, or their projections of net operating income.
 
 
 17
 Despite Arthur Andersen's extremely negative oral report, the due diligence team requested Arthur Andersen to conduct further review of the package and submit a written report. On December 26, 1989, Arthur Andersen submitted a draft report to Raymond Sweeney who in turn gave it to Chairman Carlough. Although the report stated that it did not give an opinion concerning the advisability of investing in LHLP, it raised grave concerns about the propriety of the investment. For example, Arthur Andersen questioned whether the amount of expenditures spent during the past five years on refurbishment of the hotels was adequate and whether any significant maintenance had been deferred. In this regard, Arthur Andersen reported that:
 
 
 18
 The average age of the [h]otels is 23 years. The [h]otels, because of their age, are becoming physically obsolete and may require substantial ongoing renovation to retain their market positions. [H]otels this old require substantial maintenance and replacement of plumbing, HVAC systems, roofs, parking lots and walkways. Further, old Holiday Inns and other mid-market full-service franchise properties are very vulnerable to competition from new budget motels and all-suite properties which may provide better value to the guest.
 
 
 19
 (J.A. 1586). For a second example, Arthur Andersen questioned the basis for AAA's projected increases in occupancy rates and the attendant increases in net operating income, given the fact that no increases in the primary competitive supply of lodging accommodations were projected beyond 1990 and the historical net operating income levels of the properties had been flat for the past five years. For a third example, Arthur Andersen opined that "[t]here was nothing presented in the material which we reviewed which would indicate how the projected increases in net operating income will be obtained." (J.A. 1591).
 
 
 20
 In response to Arthur Andersen's report, Oakleigh Thorne, as a member of the due diligence team, assured Arthur Andersen by letter on January 9, 1990 as to the independent nature of AAA's appraisals, specifically noting that "the increases were projected by AAA, after the benefit of on-site visits in 1987 combined with subsequent updated off-site analysis, not by Larken management." (J.A. 1753). The due diligence team nonetheless continued to examine AAA's projections of net operating income, both on its own and by requesting information from LPI, including Larken, Inc.'s internal operating budgets for 1990. The request for the budgets caused Charles Underbrink and Larry Cahill some concern, because significant differences existed between the budgets for some of the hotels and AAA's projections of net operating income. To conceal those differences, Charles Underbrink and Larry Cahill changed certain figures in the internal operating budgets for those hotels so they appeared consistent with AAA's projections of net operating income.
 
 
 21
 As a result of its further efforts, the due diligence team submitted a supplemental report to the Former Trustees in late January 1990, in which it concluded:
 
 
 22
 [AAA's] income projections for 1990 and 1991 were realistic, and ... the occupancy projections for the 1992 and beyond time period, (which are generally capped in 1993 or 1994) were reasonable. However, we found the projected increases in average daily rates beyond 1992, which continue to increase at 3% to 6%, to be optimistic. (Note: We do accept [AAA's] projections as a possible scenario, but feel a more conservative projection is warranted to bracket the range of expected returns and to serve as the basis to invest.) These average daily rate increases are the primary source of operating income increases in the 1992 and beyond time period. Therefore, as presented in the original Thorne report, we accepted [AAA's] income projections through 1991, but provided a more conservative projection, with a 1.5% annual aggregate portfolio income increase for the rest of the investment period....
 
 
 23
 (J.A. 1176-77). According to the due diligence team, its findings were supported in part by Larken, Inc.'s internal operating budgets for 1990:
 
 
 24
 Further support for [AAA's] 1990 projections is provided by the recently received Larken 1990 internal operating budgets. In the aggregate, the portfolio net operating income budgets are $13.9 million, or 1.1% above [AAA's] 1990 projections. These budgets are the basis for general manager incentive compensation, and result from negotiated performance projections between Derrick Rackham and each general manager. As a result, these budgets tend to be conservative, and historically Larken general managers do meet or exceed budgets and receive incentive bonuses.
 
 
 25
 (J.A. 1178).
 
 
 26
 Accompanying the due diligence team's supplemental report was the final report of Arthur Andersen, which raised the same concerns regarding the LHLP investment proposal as it had in its draft report, but in slightly watered down language in some instances. Specifically, Arthur Andersen had substituted some of the strongly worded paragraphs setting forth the risks of the LHLP investment proposal in bold, all capital letters, with a series of questions to be answered by the due diligence team. According to Jack Krichavsky, the person heading up Arthur Andersen's review team, the report was changed in response to a suggestion by lawyers at Rogovin, Huge, and Schiller that Arthur Andersen rewrite many of the strongly worded paragraphs.
 
 
 27
 On February 23, 1990, the Former Trustees voted to invest $15 million in LHLP. The deal was structured so that the Pension Fund would own a 37.5% interest in LHLP at a cost of $4,500,000 and would hold a $10,500,000 note from LHLP at 12% interest. The note was payable semiannually with a maturity date of November 30, 1994.
 
 
 28
 The closing occurred on February 26, 1990. As part of the deal, Larken, Inc. provided the Pension Fund with a certificate of representations and warranties and indemnity (the Warranty). The Warranty represented and warranted that "the financial forecasts ... delivered to [the Pension Fund] have been prepared on the basis of sound financial planning practice and are neither incorrect nor misleading in any material respect." (J.A. 1337). The Warranty also represented and warranted that neither Larken, Inc. nor LPI had furnished the Pension Fund with any document that contained an "untrue statement of a material fact or omit[ted] to state a material fact necessary to make the statements contained therein not misleading." (J.A. 1347). In the Warranty, Larken, Inc. further agreed that it would hold the Pension Fund harmless for any loss suffered as a result of the failure of any of its representations and warranties to be true and correct in any material respect. The Warranty's introductory language states that it was "executed and delivered by" Larken, Inc. "to induce the [Pension Fund] ... to enter into and consummate the transactions contemplated by" the various agreements by which the Pension Fund was to invest in LHLP. (J.A. 1334).
 
 
 29
 B. LHLP Fails to Meet its Obligations to the Pension Fund
 
 
 30
 Following the Pension Fund's investment in LHLP, LHLP failed to meet its budgeted performance for each month in 1990 except for the month of March. By July 1991, LHLP did not have sufficient cash flow to make its interest payments on the note held by the Pension Fund.
 
 
 31
 In July 1991, Chairman Carlough instructed Williams to "do a comparison of the performance of the portfolio compared to those projections which we were given by Larken at the time we were presented with the investment." (J.A. 1263). Edward Williams' comparison showed that the hotels were performing substantially below the projections the Pension Fund was provided at the time of its investment in LHLP. On behalf of the Pension Fund, Edward Williams wrote James Beck and Charles Underbrink on July 31, 1991, requesting that Larken, Inc. immediately develop a "cohesive plan" to deal with the default and with the apparent problems with the hotel portfolio. (J.A. 1264). The letter also warned that Chairman Carlough was willing for the Pension Fund to take "whatever action is necessary to protect the Fund's investment in the hotel portfolio." Id.
 
 
 32
 C. The Pension Fund Learns That It Was Potentially Defrauded
 
 
 33
 In the fall of 1991, the Cahill brothers discovered that James Beck and Charles Underbrink were part owners of a company known as the Pine Valley Land Company and another known as Sandia Mortgage, which companies James Beck and Charles Underbrink had used to obtain $1,500,000 from the Cahills to pay commissions to "Chicago brokers" in connection with another transaction in late 1990. In December 1991, the Cahills sued James Beck and Charles Underbrink in Minnesota state court alleging that James Beck and Charles Underbrink had misrepresented their ownership interest in the two companies, the Pine Valley Land Company and Sandia Mortgage. On January 22, 1992, Edward Williams advised attorney Otto Grunow of Rogovin, Huge, and Schiller about the Minnesota action. Edward Williams forwarded a copy of the complaint in the Minnesota action to Otto Grunow and requested that he "look at the options which are available to the Fund." (J.A.1972).
 
 
 34
 On February 22, 1992, Otto Grunow recommended that the Pension Fund undertake a thorough investigation concerning the accuracy of the representations and warranties in all financial and other information furnished to the Pension Fund's due diligence team at the time of closing. According to Otto Grunow, "any material defaults under these representations and warranties" would provide "potential recourse directly against Larken." (J.A. 1310-11).
 
 
 35
 On March 17, 1992, Charles Underbrink and James Beck filed an answer and amended counterclaims in the Minnesota action alleging that Larken, Inc., LPI and the Cahill brothers had "misrepresented the financial performance of the 21 hotels transferred to LHLP for at least one year prior to the investment by [the Pension Fund] for the purposes of artificially increasing the profits in order to induce [the Pension Fund] to invest in the LHLP." (J.A. 1059). Acting on Otto Grunow's recommendations, Edward Williams arranged for an audit of LHLP to investigate several concerns, including James Beck and Charles Underbrink's allegation of misrepresentations. The audit did not reveal any misrepresentations of historical facts concerning the operation of the hotels, but the audit revealed that the pro forma balance sheet of LHLP delivered to the Pension Fund prior to closing misrepresented an amount due from Larken, Inc. and that Larken, Inc. had misallocated expenses after the Pension Fund invested in LHLP. After reviewing the report, Otto Grunow stated in a September 1, 1992 memo to Edward Williams that "the portfolio's below par performance is certainly a fair topic of discussion with the Cahills." (J.A.2072).
 
 
 36
 On October 6, 1992, Otto Grunow alerted Edward Williams that the statute of limitations was arguably close on the Pension Fund's potential claims against Larken, Inc., LPI, Inc., James Beck and Charles Underbrink in connection with the LHLP transaction. In an October 1992 memo to Edward Williams, Grunow recommended that the Pension Fund settle certain claims within a few weeks in order to avoid any applicable time bar:
 
 
 37
 [W]e should be wary of the passage of time because certain potential claims by [the Pension Fund] could ultimately be barred by the statute of limitations if matters are not settled in the next several weeks. We have not researched all the potentially relevant limitations periods, but it is not uncommon for some causes of action to be barred after one year from the date the claimant discovered (or should have discovered) the underlying facts giving rise to the claim. The initiation of the Cahills' lawsuit in December 1991 and the filing of Underbrink's and Beck's counterclaims in March 1992 potentially put [the Pension Fund] on notice of the relevant facts. Consequently, the first anniversary of the "discovery" point may be fast approaching. Securities law claims must typically be brought within one year of discovery but no later than three years from the underlying transaction. In this case, regardless of when [the Pension Fund] first discovered the underlying facts, a securities claim could be barred after the third anniversary of the closing, i.e., February 1993.
 
 
 38
 (J.A. 1317).
 
 
 39
 D. The Pension Fund Enters Into A Settlement Agreement With
 
 LHLP, Larken, Inc., And LPI
 
 40
 At this point, the Pension Fund elected to work with Larken, Inc. to restructure the transaction in order to realize a reasonable return on the Pension Fund's investment in LHLP. These negotiations led to a November 30, 1992 settlement agreement between LHLP, Larken, Inc., LPI, and the Pension Fund (the Settlement Agreement). The Settlement Agreement purported to "settle[ ] the issues between [these parties]." (J.A. 1320). As a result of this agreement, several significant assets were transferred from LHLP to the Pension Fund. In October 1993, the Pension Fund valued the amount received under the settlement agreement at $6,937,867.[1]
 
 E. The Ensuing Litigation
 
 41
 On April 29, 1994, the Pension Fund, the administrator of the Pension Fund (Marc LeBlanc), and a participant in the Pension Fund (John Harrington) (collectively the Pension Fund Plaintiffs) filed suit in United States District Court for the Northern District of Iowa against Edward Williams, Oakleigh Thorne, Thorne Consultants, Inc., Rick Mandrell, the Cahill brothers, James Beck, Charles Underbrink, Larken, Inc., LPI, and three Former Trustees (Chairman Carlough, Gordon Jones, and Cavet Snyder). By the time this complaint had been amended three times, it alleged six causes of action (the ERISA Complaint). Count I alleged breach of fiduciary duties by Edward Williams, Oakleigh Thorne, Thorne Consultants, Inc., Rick Mandrell and the three Former Trustees in violation of several sections of ERISA. See 29 U.S.C. §§ 1104(a), 1105(a), 1106(b). Count II alleged participation by Edward Williams, Oakleigh Thorne, Thorne Consultants, Inc., Rick Mandrell, the Cahill brothers, Larken, Inc., LPI, James Beck, and Charles Underbrink in transactions prohibited by § 406(a)(1)(D) and § 406(b) of ERISA, 29 U.S.C. § 1106(a)(1)(D), (b). Count III alleged breach of fiduciary duties by the Cahill brothers, Larken, Inc., LPI, James Beck and Charles Underbrink in violation of several sections of ERISA. See 29 U.S.C. §§ 1104(a), 1105(a), 1106(b). Count IV alleged a state common law cause of action for breach of warranty against Larken, Inc. This count sought to recover Pension Fund losses resulting from Larken, Inc.'s alleged breach of warranties made in the Warranty. Count V alleged a state common law cause of action for fraud against Larken, Inc., LPI, the Cahill brothers, James Beck and Charles Underbrink.[2] Finally, Count VI alleged securities fraud by Larken, Inc., LPI, the Cahill brothers, James Beck and Charles Underbrink in violation of Iowa's Uniform Securities Act, Iowa Code Ann. § 502.401 (West 1998).
 
 
 42
 Not quite a year later, the then current trustees of the Pension Fund (Arthur Moore, Alan Chermak, Matthew Hernandez, Clinton Gowan, Ronald Palmerick, and Bruce Stockwell) (collectively the Current Trustees) filed a related diversity action alleging three state common law causes of action in the United States District Court for the Northern District of Iowa against the Cahill brothers, James Beck, Charles Underbrink, Larken, Inc., LPI, Edward Williams, Oakleigh Thorne, and Rick Mandrell. None of the counts specified a particular state's law as being applicable. We will refer to this complaint as the Diversity Complaint. Count I alleged a state common law cause of action for breach of warranty against Larken, Inc. In language nearly identical to Count V of the ERISA Complaint, Count II alleged a state common law cause of action for fraud against Larken, Inc., LPI, the Cahill brothers, James Beck and Charles Underbrink. Count III alleged a state common law cause of action for breach of contract against Larken, Inc. and LPI for having withdrawn all of the capital that the Pension Fund had made available to LHLP, thus placing LHLP in the position that it did not have sufficient capital to maintain and improve the twenty-one hotels, thereby damaging the Pension Fund.
 
 
 43
 Subsequently, Larken, Inc. filed a related diversity action alleging breach of contract against the Pension Fund in the United States District Court for the Northern District of Iowa. These claims were later asserted as an amended counterclaim to the ERISA Complaint.
 
 
 44
 The three actions were consolidated, and in November 1995, the consolidated action was transferred to the United States District Court for the Eastern District of Virginia. The Appellants ultimately settled with Chairman Carlough, Former Trustee Gordon Jones, Former Trustee Cavet Snyder, Edward Williams, Rick Mandrell, Oakleigh Thorne, and Thorne Consultants, Inc., for a total of $7,210,000. On motions to dismiss, pursuant to Federal Rule of Civil Procedure 12(b)(6), by the remaining defendants (collectively the Appellees),[3] the district court dismissed all three counts in the Diversity Complaint as preempted by ERISA.
 
 
 45
 The district court dismissed Count I of the ERISA Complaint, because a settlement had been reached with all defendants named in that count. The district court dismissed Count II of the ERISA Complaint pursuant to Rule 12(b)(6) on the ground that ERISA did not provide a cause of action against the Appellees for their participation in a transaction prohibited under ERISA § 406(b), 29 U.S.C. § 1106(b). The district court dismissed Count III of the ERISA Complaint on the basis that none of the remaining defendants listed in that count were fiduciaries of the Pension Fund. The case went forward on Counts IV, V, and VI of the ERISA Complaint and on Larken, Inc.'s counterclaim. Based on its belief that ERISA preempted any common law cause of action against the Appellees for breach of warranty or fraud, with respect to Counts IV and V, the district court held that the claims had to proceed under federal common law.
 
 
 46
 At the conclusion of discovery, the district court granted summary judgment in favor of the Appellees on Counts IV, V, and VI, and in favor of the Pension Fund Plaintiffs on Larken, Inc.'s counterclaim for breach of contract. With respect to Count IV, the breach of warranty claim, the district court granted summary judgment in favor of Larken, Inc. on alternative grounds: (1) the parties signed the Warranty three days after the Pension Fund had formally signed its agreement with Larken, Inc., and therefore, the Warranty could not have induced the Pension Fund to invest in LHLP; and (2) the district court reasoned that the Pension Fund had waived its right to sue on the Warranty by entering into the Settlement Agreement. With respect to Count V, the district court reasoned that summary judgment in favor of the Appellees was warranted because: (1) the Pension Fund had waived its right to bring a claim for fraud by entering into the Settlement Agreement, (2) even if it had not waived its right to bring the claim, the Pension Fund cannot show reasonable reliance, and (3) there was insufficient evidence of commercial bribery. With respect to Count VI, the district court believed the statute of limitations barred the claim.
 
 
 47
 All parties sought an award of attorneys' fees and costs under ERISA § 502(g)(1), 29 U.S.C. § 1132(g). The district court refused to award the Current Trustees or the Pension Fund Plaintiffs any amount for attorneys' fees and costs, but awarded $125,741.85 to James Beck; $906,352.49 to Larken, Inc., LPI, and the Cahill brothers; and $157,235.49 to Charles Underbrink.
 
 
 48
 The Current Trustees and Pension Fund Plaintiffs noted a timely appeal, assigning numerous errors to the district court. The Current Trustees challenge the district court's dismissal of that portion of Count II of the Diversity Complaint alleging that the Appellees made fraudulent and misleading statements in order to induce the Pension Fund to invest in LHLP in violation of state common law. The Pension Fund Plaintiffs challenge the district court's dismissal of that portion of Count II of the ERISA Complaint stating a cause of action under ERISA § 502(a)(3) for the Appellees' alleged participation in transactions prohibited by ERISA § 406(b)(2) and (b)(3), 29 U.S.C. § 1106(b)(2)-(3). Additionally, the Pension Fund Plaintiffs challenge the district court's grant of summary judgment in favor of Larken, Inc. on Count IV of the ERISA Complaint alleging breach of warranty and in favor of the Appellees on Count V of the ERISA Complaint alleging fraud and negligent misrepresentation. Finally, the Current Trustees and the Pension Fund Plaintiffs complain that the district court abused its discretion by: (1) refusing to grant them leave to depose a former employee of Larken, Inc. after the close of discovery; (2) refusing to award them attorneys' fees; and (3) awarding the Appellees attorneys' fees.[4]
 
 II.
 
 49
 The Current Trustees first challenge the district court's dismissal, pursuant to Rule 12(b)(6), of that portion of Count II of the Diversity Complaint alleging that the Appellees made fraudulent and misleading statements in order to induce the Pension Fund to invest in LHLP in violation of state common law. We review the district court's dismissal de novo. See Flood v. New Hanover County, 125 F.3d 249, 251 (4th Cir.1997).
 
 
 50
 Dismissal of Count II of the Diversity Complaint pursuant to Rule 12(b)(6) was appropriate only if, accepting the factual allegations in the Diversity Complaint as true and construing those facts in the light most favorable to the Current Trustees, it appears beyond doubt that the Current Trustees could prove no set of facts in support of their claim which would entitle them to relief. See Flood, 125 F.3d at 251. The district court concluded that dismissal was appropriate on the ground that ERISA preempted the claim. In reaching this conclusion, the district court relied on ERISA's express preemption clause, set forth in ERISA § 514(a), that ERISA "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan ...." 29 U.S.C. § 1144(a) (emphasis added).
 
 
 51
 The issue before this court is whether ERISA's express preemption clause precludes trustees of a pension plan subject to ERISA from suing a third party, who is neither a fiduciary nor a party in interest with respect to the pension plan, under state common law for damages allegedly flowing from the pension plan's reliance on allegedly fraudulent and misleading statements made by the third party in connection with an investment opportunity. Our analysis of this issue begins with the normal presumption that Congress does not intend to preempt state law. See De Buono v. NYSA-ILA Medical and Clinical Servs. Fund, 520 U.S. 806, 117 S.Ct. 1747, 1751, 138 L.Ed.2d 21 (1997). We next " 'go beyond the unhelpful text' " of § 514(a) " 'and the frustrating difficulty of defining its key term' " "relates to," and apply a pragmatic approach of looking to the objectives of ERISA to determine whether the normal presumption against preemption has been overcome in this case. Id. (quoting New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co., 514 U.S. 645, 656, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995)).
 
 
 52
 ERISA's main objective is to "protect ... the interests of participants in employee benefit plans and their beneficiaries, ... by establishing standards of conduct, responsibility, and obligation for fiduciaries ... and ... by providing for appropriate remedies, sanctions, and ready access to the Federal courts." 29 U.S.C. § 1001(b). In passing ERISA's preemption provision, we know that Congress intended:
 
 
 53
 "to ensure that plans and plan sponsors would be subject to a uniform body of benefits law; the goal was to minimize the administrative and financial burden of complying with conflicting directives among States or between States and the Federal Government ..., [and to prevent] the potential for conflict in substantive law ... requiring the tailoring of plans and employer conduct to the peculiarities of the law of each jurisdiction."
 
 
 54
 Travelers Ins. Co., 514 U.S. at 656-57, 115 S.Ct. 1671 (quoting Ingersoll-Rand Co. v. McClendon, 498 U.S. 133, 142, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990)) (alteration and elipses in original). We also know that Congress intended ERISA to preempt at least three categories of state laws that can be said to have a connection with an ERISA plan. See Coyne & Delany Co. v. Selman, 98 F.3d 1457, 1468 (4th Cir.1996).
 
 
 55
 First, Congress intended ERISA to preempt state laws that "mandate[ ] employee benefit structures or their administration." ... Second, Congress intended to preempt state laws that bind employers or plan administrators to particular choices or preclude uniform administrative practice, thereby functioning as a regulation of an ERISA plan itself.... Third, in keeping with the purpose of ERISA's preemption clause, Congress intended to preempt "state laws providing alternate enforcement mechanisms" for employees to obtain ERISA plan benefits.
 
 
 56
 Id. (quoting Travelers, 514 U.S. at 658, 115 S.Ct. 1671). Finally, we know that Congress did not intend to preempt traditional state-based laws of general applicability that do not implicate the relations among the traditional ERISA plan entities, including the principals, the employer, the plan, the plan fiduciaries, and the beneficiaries. Custer v. Sweeney, 89 F.3d 1156, 1167 (4th Cir.1996).
 
 
 57
 We hold that allowing the Current Trustees' common law fraud claim to go forward against the Appellees does not undermine any of ERISA's objectives. The claim does not threaten ERISA's objectives of protecting the interests of participants in employee benefit plans and their beneficiaries by establishing standards of conduct, responsibility, and obligations for fiduciaries and by providing for appropriate remedies, sanctions, and ready access to the federal courts. Nor does the claim subject plan administrators and plan sponsors to conflicting directives among states or between states and the federal government. Finally, the claim does not create the potential for conflict in substantive law requiring the tailoring of plans and employer conduct to the peculiarities of the law of each state. In sum, the claim does not threaten in any way Congress' goal of national uniformity in the administration of employee welfare and pension plans.
 
 
 58
 We also hold that the claim does not fall within any of the categories of laws that courts have generally held to be preempted by ERISA. Specifically, the claim does not mandate employee benefit structures or their administration, bind employers or plan administrators to particular choices or preclude uniform administrative practice, or provide alternate enforcement mechanisms for employees to obtain ERISA plan benefits.
 
 
 59
 We have no doubt that the Current Trustees' common law fraud claim is a traditional state-based law of general applicability that does not implicate the relations among the traditional ERISA plan entities, including the principals, the employer, the plan, the plan fiduciaries, and the beneficiaries. The fact that the Pension Fund is subject to ERISA is of no consequence to its common law fraud claim against the Appellees. With respect to this claim, the Pension Fund is simply in the role of an investor allegedly wronged. For all of these reasons, we hold that the Current Trustees' common law fraud claim as set forth in Count II of the Diversity Complaint, insofar as that count alleged fraudulent misrepresentations by the Appellees in connection with the opportunity to invest in LHLP, is not preempted by ERISA's express preemption clause.
 
 
 60
 Having concluded that Count II of the Diversity Complaint is not preempted, we would normally just reverse the district court's order dismissing this count and remand for further proceedings. However, such action is not automatically called for in this case, because (1) the allegations of acts constituting common law fraud in Count II of the Diversity Complaint are in all material respects identical to those in Count V of the ERISA Complaint on which the district court granted summary judgment in favor of the Appellees, and (2) the Appellants appear to agree that if we hold Count II of the Diversity Complaint not to be preempted by ERISA, then we should simply consider that only one common law cause of action for fraud has been asserted. The Appellants ask us to apply Iowa substantive law to such a claim.
 
 
 61
 Treating this case as if the Appellants have asserted one cause of action against the Appellees for common law fraud, and assuming without deciding that Iowa substantive law is applicable to review the merits of such a claim, we hold that the district court properly entered summary judgment in favor of the Appellees. Summary judgment in favor of a defendant in a civil action is appropriate when, after adequate time for discovery and upon motion, the plaintiff "fails to make a showing sufficient to establish the existence of an element essential to [the plaintiff's] case, and on which [the plaintiff] will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). We review de novo the district court's decision to grant summary judgment in favor of the Appellees. See Smith v. Virginia Commonwealth Univ., 84 F.3d 672, 675 (4th Cir.1996) (en banc ). In so doing, we must view the evidence in the light most favorable to the Appellants. See id.
 
 
 62
 In Iowa, "[t]he elements of fraud are: (1) representation, (2) falsity, (3) materiality, (4) scienter, (5) intent to deceive, (6) justifiable reliance, and (7) resulting injury and damage." McGough v. Gabus, 526 N.W.2d 328, 331 (Iowa 1995). Under Iowa law, the justifiable reliance element does not impose an objective standard, but asks " 'whether the complaining party, in view of his own information and intelligence, had a right to rely on the representations.' " Id. at 332 (quoting Lockard v. Carson, 287 N.W.2d 871, 878 (Iowa 1980)).
 
 
 63
 Here, the core allegations of fraud concerned the Appellees' representation that the AAA appraisals were prepared independent of the Appellees, the Appellees' failure to disclose that the net income projections in the AAA appraisals were inflated, and the Appellees' failure to disclose that some of the 1990 internal operating budgets were inflated so as to appear consistent with the inflated net income projections in the AAA appraisals. Assuming for the sake of argument that reasonable jurors could find materiality, falsity, scienter, intent to deceive, reliance, and resulting injury and damage, we hold that the Appellants' fraud claim fails as a matter of law, because no reasonable juror could find justifiable reliance on the Appellees' statements and omissions in investing fifteen million dollars in LHLP. Specifically, in view of the Pension Fund's own information and intelligence, it did not have a right to rely on the Appellees' representation that AAA's appraisals were independent in nature, the Appellees' failure to disclose that the income projections in the AAA appraisals were inflated, or their failure to disclose that some of the 1990 internal operating budgets had been inflated. First, the Pension Fund is a sophisticated business entity with considerable experience in evaluating investment opportunities. Second, the Pension Fund obtained an outside professional opinion to the effect that despite the alleged independent nature of the AAA appraisals, they were completely unreliable. Indeed, after reviewing AAA's alleged independent appraisals, historical information concerning the hotels, and other documents, Arthur Andersen told the Pension Fund "[t]here was nothing presented in the material which we reviewed which would indicate how the projected increases in net operating income[in AAA's appraisals] will be obtained." (J.A. 1591). Critically, the Pension Fund never subsequently came into possession of any information indicating how the projected increases in net operating income as contained in AAA's appraisals would be obtained. Thus, independent or not, the Pension Fund was on notice that the AAA appraisals did not provide a justifiable basis on which to invest fifteen million dollars in LHLP.
 
 
 64
 In response to these observations, the Appellants argue that the reliability of the AAA appraisals was restored by the Pension Fund's subsequent receipt of Larken, Inc.'s 1990 internal operating budget for each hotel, which appeared to corroborate AAA's income projections in the appraisals. This argument misses the mark, however, because the 1990 internal operating budgets, secretly inflated as some were, did not and could not explain the critical question raised by Arthur Andersen of how the projected increases in net operating income as contained in AAA's appraisals would be obtained.
 
 
 65
 Furthermore, if the fact that the Pension Fund never received any information explaining how the projected increases in operating income would be obtained was not enough to make it run, not walk away, from investing in LHLP, Arthur Andersen reported unequivocally to the Pension Fund that the twenty-one hotels were "not investment-grade properties--they [we]re old [h]otels with short remaining lives and high risks," and that "[t]here is little likelihood that the value of these [h]otels will increase over the next five years, and a high likelihood that the values will decline in the future." (J.A. 598). In sum, in light of the negative assessments of Arthur Andersen, of which the Pension Fund was aware, and the sophistication of the Pension Fund as an investor, no reasonable juror could find that the Pension Fund was justified in relying on the representations and omissions at issue. Accordingly, we affirm the district court's entry of summary judgment on the Appellants' common law fraud claim.
 
 III.
 
 66
 We now turn to review the district court's dismissal of Count II of the ERISA Complaint, which alleged, in pertinent part, that the Appellees knowingly participated in an ERISA fiduciary's violation of ERISA § 406(b) "by offering Williams ... a fee, kickback or commission to persuade and to induce the [Pension Fund] to invest in LHLP and by providing Williams ... with false information to assist [him] in persuading the [Pension Fund] to make what Williams ... knew or should have known was an imprudent investment in LHLP, an enterprise in which Larken, the Cahills, Beck, Underbrink and LPI had a financial interest."[5] (J.A. 174). With respect to remedy, the Pension Fund sought restitution to restore it to its preinvestment position and disgorgement of the profits and gains realized by the Appellees as a result of their allegedly wrongful conduct.
 
 
 67
 The district court dismissed Count II of the ERISA Complaint for failure to state a claim upon which relief can be granted. See Fed.R.Civ.P. 12(b)(6). Specifically, the district court ruled that ERISA did not provide the Pension Fund Plaintiffs a cause of action against the Appellees as nonfiduciaries for their alleged knowing participation in Williams' alleged violation of ERISA § 406(b). We review the district court's dismissal de novo, accepting all the factual allegations set forth in the ERISA Complaint as true and construing those facts in the light most favorable to the Pension Fund Plaintiffs. See Flood, 125 F.3d at 251.
 
 
 68
 The Pension Fund Plaintiffs argued below and continue to argue on appeal that ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a cause of action against the Appellees for knowingly participating in Williams' alleged violation of ERISA § 406(b)(2) and ERISA § 406(b)(3). ERISA § 502(a)(3) provides, in relevant part, that "[a] civil action may be brought--... (3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of [ERISA] or the terms of the plan, or (B) to obtain other equitable relief (i) to redress such violations or (ii) to enforce any provisions of [ERISA] or the terms of the plan...." 29 U.S.C. § 1132(a)(3). ERISA § 406(b) provides in relevant part, that:
 
 
 69
 A fiduciary with respect to a plan shall not--
 
 
 70
 * * * * * *
 
 
 71
 (2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or
 
 
 72
 (3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.
 
 
 73
 29 U.S.C. § 1106(b).
 
 
 74
 According to the Pension Fund Plaintiffs, Williams, as an ERISA fiduciary, violated ERISA § 406(b)(2) and (b)(3) by recommending that the Pension Fund invest in LHLP while engaging in a favorable business relationship with and proposed by the Appellees. With respect to ERISA § 406(b)(2), the Pension Fund Plaintiffs contend that the ERISA Complaint can be read to allege that Williams acted in the LHLP investment transaction on behalf of the Appellees whose interests were adverse to the interests of the Pension Fund. Finally, with respect to ERISA § 406(b)(3), the Pension Fund Plaintiffs contend that the ERISA Complaint can be read to allege that Williams received consideration from the Appellees in the form of establishing a favorable business arrangement with the Appellees whereby he would have the opportunity to make considerable sums of money.
 
 
 75
 Read together, the Pension Fund Plaintiffs argue, ERISA § 502(a)(3) and ERISA § 406(b)(2) and (b)(3) provide them with a cause of action against the Appellees for appropriate equitable relief to redress the violation of ERISA § 406(b)(2) and (b)(3). The fact that ERISA § 406(b) imposes the duty to refrain from prohibited transactions on fiduciaries and not on third parties is irrelevant, the Pension Fund argues, because ERISA § 502(a)(3) reaches "acts or practices" that violate ERISA and prohibited transactions violate ERISA § 406(b). Furthermore, the Pension Fund argues that allowing a cause of action against the Appellees as nonfiduciaries does not run afoul of the Supreme Court's dicta in Mertens v. Hewitt Associates, 508 U.S. 248, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993), which casts serious doubt on the viability of a cause of action against a nonfiduciary pursuant to ERISA § 502(a)(3) for knowing participation in a fiduciary's breach of his fiduciary duties as set forth in ERISA § 404, because, unlike ERISA § 404, the prohibited transactions specified in ERISA § 406(b) explicitly involve two parties. Finally, the Pension Fund relies on four post-Mertens federal appellate decisions by analogy in support of its position. See Reich v. Stangl, 73 F.3d 1027, 1030-34 (10th Cir.), cert. denied, --- U.S. ----, 117 S.Ct. 48, 136 L.Ed.2d 13 (1996); Landwehr v. DuPree, 72 F.3d 726, 733-34 (9th Cir.1995); Reich v. Compton, 57 F.3d 270, 285-87 (3d Cir.1995); Reich v. Rowe, 20 F.3d 25, 31 (1st Cir.1994)(dicta). See also Herman v. S.C. Nat'l Bank, 140 F.3d 1413, 1419-22 (11th Cir.1998).
 
 
 76
 The Appellees contest the Pension Fund Plaintiffs' reading of ERISA § 502(a)(3) as providing a cause of action against nonfiduciaries to obtain "appropriate equitable relief" to redress violations of ERISA § 406(b)(2) and (b)(3) on the ground that to recognize a cause of action under ERISA § 502(a)(3) against nonfiduciaries who participated in a transaction prohibited under ERISA § 406(b)(2) or (b)(3) runs afoul of the Supreme Court's dicta in Mertens. Alternatively, the Appellees contend that Count II of the ERISA Complaint was properly dismissed because it does not seek any relief available under ERISA § 502(a)(3).
 
 A.
 
 77
 We will first address the issue of whether ERISA § 502(a)(3) allows the Pension Fund Plaintiffs to bring a cause of action against the Appellees for appropriate equitable relief on account of their alleged knowing participation in a transaction prohibited by ERISA § 406(b)(2) and (3). Having already set forth the relevant portions of ERISA §§ 406 and 502, we begin our analysis with a discussion of Mertens. In that case, former employees of Kaiser Steel Corporation (Kaiser) who participated in Kaiser's ERISA qualified pension plan sued the plan's trustees and the plan's actuary following the plan's failure to meet its benefit obligations. Id. at 250, 113 S.Ct. 2063. Claiming that the services provided by the actuary had been deficient and caused the plan to be inadequately funded, the pensioners sought to hold the actuary liable for "all the losses that the plan sustained as a result of the alleged breach of fiduciary duty" by the plan's trustees. Id. at 255, 113 S.Ct. 2063. The pensioners accepted that the actuary was not a fiduciary within the meaning of ERISA, but relying on ERISA § 502(a)(3), nevertheless maintained the actuary could be held liable for its knowing participation in the alleged breach of fiduciary duties set forth in ERISA § 404, 29 U.S.C. § 1104, by the plan's trustees.[6] See id. at 253, 113 S.Ct. 2063.
 
 
 78
 The only issue squarely before the Court in Mertens was whether the remedy sought by the pensioners constituted "appropriate equitable relief" as opposed to a legal remedy. See id. at 255, 113 S.Ct. 2063. However, the Court's opinion discussed in dicta the antecedent question of whether ERISA § 502(a)(3) creates a cause of action against nonfiduciaries for knowing participation in an ERISA fiduciary's breach of fiduciary duty as set forth in ERISA § 404. Specifically, the Court stated:
 
 
 79
 [W]hile ERISA contains various provisions that can be read as imposing obligations upon non-fiduciaries, including actuaries, no provision explicitly requires them to avoid participation (knowing or unknowing) in a fiduciary's breach of fiduciary duty. It is unlikely, moreover, that this was an oversight, since ERISA does explicitly impose "knowing participation" liability on cofiduciaries. See § 405(a), 29 U.S.C. § 1105(a). That limitation appears all the more deliberate in light of the fact that "knowing participation" liability on the part of both cotrustees and third persons was well established under the common law of trusts.... In [Massachusetts Mutual Life Ins. Co. v. Russell, 473 U.S. 134, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985) ] we emphasized our unwillingness to infer causes of action in the ERISA context, since that statute's carefully crafted and detailed enforcement scheme provides "strong evidence that Congress did not intend to authorize other remedies that it simply forgot to incorporate expressly." 473 U.S. at 146-147, 105 S.Ct. 3085.
 
 
 80
 Id. at 254, 113 S.Ct. 2063 (some citations and footnote omitted). As an example of an ERISA provision that imposes obligations upon non-fiduciaries, the Court cited ERISA § 406(a)'s prohibition on parties in interest offering services or engaging in other transactions with the plan.[7] Id. at 254 n. 4, 113 S.Ct. 2063. The Court further stated in dicta that nonfiduciary service providers "must disgorge assets and profits obtained through participation as parties-in-interest in transactions prohibited by § 406...." Id. at 262, 113 S.Ct. 2063.
 
 
 81
 Following Mertens, several of our sister circuits have taken the Court's references to ERISA § 406(a)in Mertens as an indication that its statements regarding the lack of statutory provisions addressing a nonfiduciary's participation in a fiduciary's breach of fiduciary duty should not be read to preclude claims concerning prohibited transactions under ERISA § 406(a)(1). See Herman, 140 F.3d at 1422; Stangl, 73 F.3d at 1032; Landwehr, 72 F.3d at 734; Compton, 57 F.3d at 285. In Lockheed Corp. v. Spink, 517 U.S. 882, 116 S.Ct. 1783, 135 L.Ed.2d 153 (1996), the Supreme Court acknowledged that several federal courts of appeal have relied on its dicta in Mertens regarding ERISA § 406(a) in holding that a party in interest can be held liable under ERISA for participating in a prohibited transaction, and notably, the Supreme Court "declined to retreat from that dicta," Herman, 140 F.3d at 1422 n. 14. See Lockheed, 517 U.S. at 889 n. 3, 116 S.Ct. 1783. Further, the Court stated in dicta that the lower court was "not necessarily wrong in saying that 'a party in interest who benefitted from an impermissible transaction can be held liable under ERISA' (emphasis added); but the only transactions rendered impermissible by § 406(a) are transactions caused by fiduciaries." Id.
 
 
 82
 Our sister circuits which have considered the issue have uniformly held that either ERISA § 502(a)(3) or its counterpart when the Secretary of Labor is the plaintiff, see ERISA § 502(a)(5), provides a cause of action against a nonfiduciary party in interest when such party participated in a transaction prohibited by ERISA § 406(a)(1). See Herman, 140 F.3d at 1422 (§ 502(a)(5)); Stangl, 73 F.3d at 1032 (§ 502(a)(5)); Landwehr, 72 F.3d at 734 (§ 502(a)(5)); Compton, 57 F.3d at 286 (§ 502(a)(3)); Nieto v. Ecker, 845 F.2d 868, 873-74 (9th Cir.1988) (§ 502(a)(3)); see also, Rowe, 20 F.3d at 31 (§ 502(a)(5)) (dicta). The basic rationale of all these decisions is represented by the following passage from the Ninth Circuit's decision in Nieto:
 
 
 83
 It is true that section 406(a) only prohibits certain transactions by fiduciaries, and does not expressly bar parties in interest from engaging in these transactions. However, section 503(a)(3)'s language expressly grants equitable power to redress violations of ERISA; prohibited transactions plainly fall within this category. Courts may find it difficult or impossible to undo such illegal transactions unless they have jurisdiction over all parties who allegedly participated in them. In contrast to section 409(a), section 502(a)(3) is not limited to fiduciaries, and there is no reason to exempt parties in interest from this remedial provision when they engage in transactions prohibited by [ERISA].
 
 Nieto, 845 F.2d at 873-74.[8]
 
 84
 The Appellees do not challenge the holdings of these cases, but attempt to distinguish them on the basis that they all involved holding a party in interest liable for participation in a transaction prohibited by ERISA § 406(a)(1). The distinction highlighted by the Appellees, however, is without a difference. Nothing in the decisions of our sister circuits nor in the Supreme Court's dicta in Mertens or Lockheed suggests that allowing equitable relief to be obtained from nonfiduciary parties in interest who participated in a transaction prohibited under ERISA § 406(a)(1) would be any different if the transaction were prohibited under ERISA § 406(b)(2) or § 406(b)(3). The key requirement for liability is that the subsection at issue expressly prohibits a transaction involving a nonfiduciary third party. Indeed, the Third Circuit has sanctioned a cause of action under ERISA § 406(a)(1)(D) against one who is not a party in interest, because the language of that subsection extends the scope of liability beyond fiduciaries and parties in interest by prohibiting a transaction between a plan and a third party when the transaction is "for the benefit of a party in interest." See Compton, 57 F.3d at 286-87. In sum, we find the reasoning of our sister circuits persuasive and analogous to the situation before us.
 
 B.
 
 85
 We next address the Appellees' contention that we should affirm the district court's dismissal of Count II of the ERISA Complaint because the count does not seek any relief available under ERISA § 502(a)(3). We disagree.
 
 
 86
 As set forth previously, ERISA § 502(a)(3) allows a plaintiff "(A) to enjoin any act or practice which violates any provision of [ERISA] or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of [ERISA] or the terms of the plan...." 29 U.S.C. § 1132(a)(3). In Mertens, the Supreme Court construed the phrase "appropriate equitable relief" to only include "those categories of relief that were typically available in equity...." Id. at 256, 113 S.Ct. 2063; see also id. at 262, 113 S.Ct. 2063. Among the examples given by the Court of these "typical" forms of equitable relief were mandamus and restitution, but not compensatory damages. See id. at 256, 113 S.Ct. 2063. The Court made clear that restitution includes restitution of ill-gotten plan assets or profits. See id. at 260, 113 S.Ct. 2063.
 
 
 87
 Here, in Count II of the ERISA Complaint the Pension Fund Plaintiffs seek "restitution" from the Appellees "to (a) restore the [Pension] Fund to the position it held before [its investment in LHLP] and (b) disgorge the profits and gains [the Appellees] realized as a result of their wrongful conduct." (J.A. 174). The relief sought falls squarely within the Court's definition of "appropriate equitable relief" as stated in ERISA § 502(a)(3). Accordingly, we cannot affirm the district court's dismissal of this count on the basis that it fails to seek relief available under ERISA § 502(a)(3).
 
 
 88
 In conclusion, we hold that the district court erred in dismissing Count II of the ERISA Complaint pursuant to Rule 12(b)(6). We, therefore, reverse the district court's order dismissing that count and remand for further proceedings.
 
 IV.
 
 89
 The Pension Fund Plaintiffs next contend that the district court erred in entering summary judgment in favor of Larken, Inc. on Count IV of the ERISA Complaint alleging breach of warranty. The core allegations of the warranty claim essentially mirror the conduct complained about in the common law fraud claim.
 
 
 90
 One of the alternative grounds on which the district court granted Larken, Inc.'s motion for summary judgment on the breach of warranty claim was that the Pension Fund had expressly waived any right to recover under the Warranty for the representations/omissions at issue by entering into the Settlement Agreement with Larken, Inc. in December 1992, which purported to "resolve the issues" between Larken, Inc. and the Pension Fund. (J.A. 931); see Anselmo v. Manufacturers Life Ins., 771 F.2d 417, 420 (8th Cir.1985) ("It is well settled that a valid fraud claim is relinquished when the victim of the fraud enters into a subsequent agreement with the perpetrator concerning the same subject matter...."). Accordingly, the issue presented for this court is whether, viewing the evidence in the light most favorable to the Pension Fund, a reasonable juror could find that the Pension Fund was completely unaware in December 1992 of the alleged misrepresentations/omissions by Larken, Inc.
 
 
 91
 We hold that viewing the evidence in the light most favorable to the Pension Fund Plaintiffs, no reasonable juror could find that the Pension Fund was unaware in December 1992 of the alleged misrepresentations/omissions by Larken, Inc. The record is undisputed that by December 1992 the Pension Fund had learned of James Beck and Charles Underbrink's March 17, 1992 broad allegation in the state court litigation that Larken, Inc. and the Cahills had "misrepresented the financial performance of the 21 hotels transferred to LHLP for at least one year prior to the investment by [the Pension Fund] for the purposes of artificially increasing the profits in order to induce [the Pension Fund] to invest in the LHLP." (J.A. 1059). This allegation essentially encompasses all of the Pension Fund Plaintiffs' allegations of misrepresentations and omissions, and therefore, the Pension Fund was definitively on notice of such conduct by Larken, Inc. For example, as the facts unfolded in this case, Larken, Inc. could not have misrepresented the financial performance of the hotels in order to induce the Pension Fund to invest in LHLP without having somehow compromised the independent nature of the AAA appraisals. In sum, no reasonable juror could find that armed with this knowledge, the Pension Fund would have entered into the broadly worded, open ended Settlement Agreement with Larken, Inc. without intentionally reserving its right to bring a warranty action against Larken, Inc. for misrepresentations/omissions regarding the LHLP investment deal, unless the Pension Fund intended to waive that right. We, therefore, affirm the district court's grant of summary judgment in favor of Larken, Inc. on the Pension Fund Plaintiffs' breach of warranty claim.
 
 V.
 
 92
 In conclusion, we hold the district court erred by dismissing the Appellants' common law fraud claim as being preempted by ERISA, but affirm the district court's entry of summary judgment on that claim in favor of the Appellees. We also vacate the district court's dismissal of Count II of the ERISA Complaint and remand for further proceedings with respect to that count consistent with this opinion. Additionally, we affirm the district court's entry of summary judgment in favor of Larken, Inc. on Count IV of the ERISA Complaint. Finally, in light of our disposition, we vacate the district court's orders awarding the Appellees attorneys' fees and denying the Appellants attorneys' fees, and instruct the district court on remand to revisit the issue of attorneys' fees after the merits of Count II of the ERISA Complaint have been determined.[9]
 
 
 93
 AFFIRMED IN PART, VACATED IN PART, AND REMANDED.
 
 
 
 [1]
 LHLP had sought protection under Chapter 11 of the United States Bankruptcy Code three months earlier
 
 
 [2]
 Neither Count IV nor V specified which state's law was applicable
 
 
 [3]
 The Appellees are the Cahill brothers, Larken, Inc., LPI, James Beck, and Charles Underbrink
 
 
 [4]
 In order to avoid confusion, we note the Current Trustees do not challenge on appeal the district court's dismissal of Counts I and III of the Diversity Complaint, and the Pension Fund Plaintiffs do not challenge the district court's dismissal of Counts I and III of the ERISA Complaint. Furthermore, the Pension Fund Plaintiffs do not challenge on appeal the district court's grant of summary judgment in favor of the Appellees on Count VI of the ERISA Complaint
 
 
 [5]
 The Appellees do not dispute that Williams was a fiduciary of the Pension Fund as that term is defined in ERISA. See 29 U.S.C. § 1002(21)(A) ("[A] person is a fiduciary with respect to a plan to the extent ... (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has the authority or responsibility to do so....")
 
 
 [6]
 ERISA § 404 provides, in relevant part, that:
 (a) Prudent man standard of care
 (1) ... a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and--
 (A) for the exclusive purpose of:
 (i) providing benefits to participants and their beneficiaries; and
 (ii) defraying reasonable expenses of administering the plan;
 (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;
 (C) by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and
 (D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter or subchapter III of this chapter.
 29 U.S.C. § 1104(a).
 
 
 [7]
 ERISA § 406(a)(1) provides as follows:
 (a) Transactions between plan and party in interest
 Except as provided in section 1108 of this title:
 (1) A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect--
 (A) sale or exchange, or leasing, of any property between the plan and a party in interest;
 (B) lending of money or other extension of credit between the plan and a party in interest;
 (C) furnishing of goods, services, or facilities between the plan and a party in interest;
 (D) transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan; or
 (E) acquisition, on behalf of the plan, of any employer security or employer real property in violation of section 1107(a) of this title.
 29 U.S.C. § 1106(a)(1).
 
 
 [8]
 ERISA § 409(a) provides that "[a]ny person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by [ERISA] shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary. A fiduciary may also be removed for a violation of section 1111 of this title." 29 U.S.C. § 1109(a)
 
 
 [9]
 The Pension Fund contends that the district court abused its discretion in refusing more than a month before the scheduled trial date, but after the close of discovery, as set forth in the district court's scheduling order, to grant it leave to take the deposition of Larken, Inc.'s former director of operations, Derrick Rackham. We have reviewed the circumstances surrounding the Pension Fund's request and, suffice it to say, we find no abuse of discretion