**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

SHEILA PATTERSON,
Plaintiff-Appellant,

v.

No. 99-1738

COUNTY OF FAIRFAX, VIRGINIA; THE
BOARD OF COUNTY SUPERVISORS,
Defendants-Appellees.

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Claude M. Hilton, Chief District Judge.
(CA-93-788-A)

Argued: January 24, 2000

Decided: May 18, 2000

Before MICHAEL and TRAXLER, Circuit Judges, and
John T. COPENHAVER, Jr., United States District Judge for the
Southern District of West Virginia, sitting by designation.

_____

Affirmed by unpublished opinion. Judge Traxler wrote the majority
opinion, in which Judge Copenhaver joined. Judge Michael wrote a
dissenting opinion.

_____

**COUNSEL**

**ARGUED:** Claude David Convisser, CLAUDE D. CONVISSER &
ASSOCIATES, P.C., Alexandria, Virginia, for Appellant. Cynthia
Lee Tianti, Assistant County Attorney, Fairfax, Virginia, for Appel-

lees. **ON BRIEF:** David P. Bobzien, County Attorney, Robert Lyndon Howell, Deputy County Attorney, Fairfax, Virginia, for Appellees.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

TRAXLER, Circuit Judge:

Sheila Patterson ("Patterson") appeals from a grant of summary judgment in favor of the County of Fairfax ("the County") on her Title VII hostile work environment claim. We affirm.

I.

The County hired Patterson, an African-American woman, as a police officer in November 1983. Patterson filed suit in 1993 against her employer alleging a bevy of wrongs. Over the course of this litigation, this court has affirmed grants of summary judgment on Patterson's claims of discriminatory failure to promote, discriminatory denial of training opportunities, discriminatory application of disciplinary proceedings, and retaliation. See Patterson v. County of Fairfax, No. 97-1015, 1998 WL 869893 (4th Cir. Dec. 15, 1998) (per curiam) (unpublished). The only claim remaining after seven years of litigation is Patterson's claim of a hostile work environment based on sex and race. The last time Patterson's case was before us, we remanded the hostile work environment claim so that Patterson could resubmit authenticated exhibits which had been inadvertently destroyed after the initial remand. See id. After receiving Patterson's evidence, the district court again granted summary judgment because Patterson "ha[d] not established that her environment was either severe or pervasive as to alter the terms of her conditions of her employment." J.A. 105.

2

The facts giving rise to the allegedly hostile environment, viewed in the light most favorable to Patterson, are as follows. In December 1983, shortly after she was hired, Patterson and her field training officer were joined for lunch by Officer Brian McAndrew. A news segment about Jesse Jackson appeared on the restaurant's television and a discussion ensued among the officers. As the exchange grew heated, McAndrew told Patterson that the problem with her was that she was oppressed. Patterson took offense at the comment. In early 1984, Patterson had another encounter with McAndrew. While the two officers were riding together McAndrew told Patterson that she had two strikes against her: race and sex. The final incident involving McAndrew occurred in the department's locker room in 1985. McAndrew walked by Patterson when she was shining her shoes and jokingly asked her to shine his boots. Angered by the remark, Patterson reported the boots comment to Second Lieutenant Duckett who investigated the complaint. McAndrew apologized to Patterson, stressed his comment had no racial overtones, and was hugged by Patterson. The department took no further action.

Patterson next complains about the conduct of Officer William Petracca, who served as one of her training officers. According to Patterson, in 1984 Petracca rolled down the window of his police cruiser and sprayed mace out of the window so that it drifted toward her. Patterson also avers that Petracca maced her roll-call chair. Patterson never complained about the mace incidents to the department's internal affairs office.

In November 1984, Patterson and Officer Stephen Scherr had a dispute. The police dispatcher had directed Patterson to respond to a call at "Commonwealth ER." Patterson did not respond to the hospital because she was looking for the intersection of Commonwealth and ER streets. Once Officer Scherr learned that Patterson did not know that ER stood for emergency room, he called her a"dumb bitch." Patterson reported Scherr's name-calling to her superiors, but "didn't want Officer Scherr to get into any further trouble but . . . did want him to be verbally told of his wrong doing." J.A. 123. Scherr was informally counseled and apologized to Patterson.

In February 1986, Patterson and Officer Ernest Jones were scheduled to provide security for a high school wrestling match. Jones

3

arrived at the school, but learned that the match was canceled due to a winter storm. He returned to the police station and encountered Patterson in the locker room. When questioned why she did not report to the school, Patterson explained that she was delayed by heavy traffic. Jones later took umbrage at Patterson submitting a request for overtime pay when she never arrived at the high school. Jones told Patterson that "[a]ll women do is bitch. They aren't nothing but a bunch of bitches." J.A. 126. He further opined that women did not belong in the police department.

One month following the dispute with Jones, Patterson requested duty in the West Springfield District, a prized assignment because of its size. Patterson claims her supervisor denied the request and explained that only officers certified as Accident Investigation Unit Specialists (AIUS) could work in the West Springfield District. Patterson later learned that officers who were not certified AIUS had been assigned to West Springfield. In a December 1986 internal affairs investigation,[1] Patterson's supervisor denied mentioning anything about certification to Patterson. Moreover, the investigation revealed that officers were assigned to West Springfield based on their competence. The internal affairs report concluded that Patterson's previous troubles operating a camera at an accident scene prevented her assignment to West Springfield.

Patterson also maintains that her supervisors fabricated charges against her. Specifically, Patterson points to an oral reprimand she received in September 1986 for touching a citizen with her flashlight. Though Patterson admitted to "nudging" the citizen, she filed a grievance and the reprimand was upheld. Patterson further alleges that fellow officers encouraged citizens to file complaints against her, but the record is bereft of evidence that any complaints were filed.

_____

[1] In her brief, Patterson objects to consideration of the results of the internal affairs investigation which examined many of the incidents at issue here. According to Patterson, it was improperly admitted into evidence. We find that consideration of the report is proper because the County had filed it with the district court previously and there was no objection made to it at that time by Patterson. Under the pretrial order of the district court, exhibits were deemed admitted into evidence when there was no objection. Nothing in the remand undid the effect of prior submissions by the County.

4

In the fall of 1986, Patterson noticed what she described as a double standard regarding report corrections. Patterson complains that supervisors made corrections for the male officers, but required her to rewrite numerous reports. However, Patterson's 1986 Performance Rating indicated that she "habitually turns required reports in which are incomplete or misclassified." J.A. 218. The evaluator recommended that Patterson spend more time reviewing her written work, but nonetheless recommended that Patterson "receive her merit increment." J.A. 220. An internal affairs investigation revealed that many officers, on occasion, had reports returned for correction.

As further evidence of a hostile environment Patterson alleges that when she asked for back-up fellow officers would inform the dispatcher that they were too busy to respond. According to the custodian of internal affairs' records, Patterson never filed a complaint regarding refusals to provide assistance.

Automobile vandalism is also adduced by Patterson. At various times in the 1980s, Patterson reported her car was keyed, the gasoline cap stolen, the lights turned on, and the tires flattened--all while the vehicle was parked near the police station. On one occasion, Patterson left her car running in the station parking lot and returned to find the windshield wipers on and the radio's volume increased. Patterson does not know who tampered with her vehicle, but speculates it was the work of fellow officers.

Patterson has also offered two affidavits from fellow officers in which they state that other officers had referred to Patterson as "a dumb nigger" and "Zulu," and that an officer openly stated that Patterson was transferred to the Mt. Vernon station because the supervisor there "was a hatchet man and he gets rid of people the department doesn't want working for it." J.A. 127-29. These comments were not made in Patterson's presence.

Finally, Patterson points to two incidents occurring in the early 1990s. In the summer of 1990, Officer Timothy Baumker referred to Patterson as "cruiser butt" or "cruiser ass." After an investigation, Baumker received an oral reprimand. In 1992, Patterson found a dead mouse in her mailbox at the police station. An investigation ensued in which twenty-seven people were interviewed and three given poly-

5

graph examinations. The department never discovered who, if anyone, placed the mouse in the mailbox.

II.

We review the district court's grant of summary judgment <u>de novo</u>, viewing the evidence in the light most favorable to the nonmoving party. <u>See Smith v. Virginia Commonwealth Univ.</u> , 84 F.3d 672, 675 (4th Cir. 1996) (en banc). "Summary judgment in favor of a defendant in a civil action is appropriate when, after adequate time for discovery and upon motion, the plaintiff `fails to make a showing sufficient to establish the existence of an element essential to[the plaintiff's] case, and on which [the plaintiff] will bear the burden of proof at trial.'" <u>LeBlanc v. Cahill</u>, 153 F.3d 134, 148 (4th Cir. 1998) (quoting <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986) (alterations in original)).

To establish a Title VII hostile work environment claim based on race and gender, Patterson must establish four elements: (1) unwelcome conduct, (2) based on Patterson's race and gender, (3) sufficiently pervasive or severe to alter the conditions of employment and to create a hostile work environment, and (4) some basis for imputing liability to the County. <u>See Smith v. First Union Nat'l Bank</u>, No. 98-2200, 2000 WL 37744, at *4 (4th Cir. Jan. 19, 2000).

First, Patterson contends that the conduct complained of was unwelcome. We agree. The record indicates that Patterson reported many of the incidents to superiors and often protested directly to the offending officers. In light of the grievances filed and other protestations, Patterson clearly meets her burden on the first element.

Second, Patterson claims that all of the incidents complained of were based on race or sex. "General harassment if not racial or sexual is not actionable." <u>Bolden v. PRC, Inc.</u>, 43 F.3d 545, 551 (10th Cir. 1994). Viewing the evidence in a light most favorable to Patterson, we find that only seven of the incidents appear to be germane to racial or gender animus: McAndrew's "oppression" and"two strikes" comments; Scherr's "dumb bitch" remark; Jones' disparaging statements about women serving on the police force; the "dumb nigger" and "Zulu" comments, neither of which Patterson heard; and Baumker's

6

"cruiser butt" remark.**2** The remaining incidents--ranging from routine disciplinary procedures to adolescent pranks to mean-spirited behavior--are simply not susceptible to an inference of racial- or gender-based hostility. See Yarnevic v. Brink's Inc., 102 F.3d 753, 757-58 (4th Cir. 1996) (holding that remote inferences and conclusory allegations cannot defeat summary judgment). In addition, Patterson cannot link two of the episodes--the vandalism and dead mouse--to her fellow officers, and the record reveals several instances of Patterson's argumentative behavior and insubordination. Thus, inferring that all the of incidents were based on sex and race would "transmute . . . workplace disagreements between individuals of different races [and genders] into actionable race [or gender] discrimination." Hawkins v. PepsiCo, Inc., No. 98-2193, 2000 WL 159903, at *1 (4th Cir. Feb. 15, 2000). Accordingly, in examining the hostility element, we will only consider the seven incidents to have been based on race or sex.

Third, Patterson alleges that the conduct to which she was subjected was so severe and pervasive as to create a hostile work environment. A hostile work environment is actionable under Title VII because it amounts to discrimination in the conditions of employment. See Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 63-68 (1986). We cannot construe Title VII to "provide a remedy for every instance of verbal or physical harassment in the workplace," Lissau v. Southern Food Serv., Inc., 159 F.3d 177, 183 (4th Cir. 1998), nor can we forge "a federal guarantee of refinement and sophistication in the workplace." Hartsell v. Duplex Prods., Inc., 123 F.3d 766, 773 (4th Cir. 1997). Rather, Title VII "prohibits only harassing behavior that is so severe or pervasive as to render the workplace objectively hostile or abusive." Id. The Supreme Court has made it abundantly clear that

_____

**2** The County fervently asserted that "cruiser butt" or "cruiser ass" did not relate to race or gender. Instead, the county argued that it referred to officers who sit in a police cruiser "all day and don't do work." J.A. 85. The Tenth Circuit has concluded that "[t]he term `ass' is a vulgar expression that refers to a portion of the anatomy of persons of both sexes. Thus, the term is gender-neutral." Gross v. Burggraf Constr. Co., 53 F.3d 1531, 1543 (10th Cir. 1995). However, giving Patterson the benefit of all reasonable inferences, we will assume the term has some racial or sexual connotation.

7

"simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." Faragher v. City of Boca Raton, 118 S. Ct. 2275, 2283 (1998) (internal citations and quotation marks omitted).

Patterson's allegations, assuming they are true, are simply insufficient to satisfy the requirement that the harassment be so severe or pervasive as to create a hostile working environment. Initially, we note that the seven incidents in question spanned a seven-year period. So few incidents of racially or sexually motivated behavior occurring over such a long period "alone suggests the absence of a condition sufficiently pervasive to establish Title VII liability." Hopkins v. Baltimore Gas & Elec. Co., 77 F.3d 745, 753 (4th Cir. 1996); see also Baskerville v. Culligan Int'l Co., 50 F.3d 428, 431 (7th Cir. 1995) ("The infrequency of the offensive comments is relevant to an assessment of their impact. A handful of comments spread over months is unlikely to have so great an emotional impact as a concentrated or incessant barrage."); Bolden, 43 F.3d at 551 ("Instead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments."). The affronts, though uncalled for, fall short of the consistent abhorrent conduct prohibited by the statute.

Furthermore, Title VII also has a subjective component. See Faragher, 118 S. Ct. at 2283 (stating "that in order to be actionable under the statute, a sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so"). In this context, it is not lost on the court that the record indicates Patterson herself used the term"nigger" when referring to an African-American male suspect, and the term "bitch" when referring to women with whom she was upset. J.A. 205-06, 224; see Harris, 510 U.S. at 23 (stating that in determining whether an environment is hostile the court must "look[ ] at all the circumstances").

In conclusion, though the lack of professionalism shown at times by Patterson's co-workers certainly led to periods of unpleasantness, this is beyond the scope of Title VII. On one hand, courts must diligently enforce Congress' prohibitions against racial or sexual harassment in the workplace. But on the other hand, courts must also

8

"ensure that Title VII does not become a general civility code." Faragher, 118 S. Ct. at 2283-84 (internal quotation marks omitted). To hold that the incidents complained of amount to a hostile work environment would stretch Title VII beyond permissible limits. Under the circumstances, "allowing [Patterson's] claim to go to trial would countenance a federal cause of action for mere unpleasantness." Hartsell, 123 F.3d at 773. Because Patterson cannot establish a hostile environment, we do not reach imputation of the conduct to Patterson's employer.

III.

For the foregoing reasons, we affirm the district court's decision granting summary judgment to the County on Patterson's Title VII hostile work environment claim.

AFFIRMED

MICHAEL, Circuit Judge, dissenting:

Because I believe that Sheila Patterson has forecast sufficient evidence to create a triable issue of fact on her Title VII claim, I must respectfully dissent.

To make out a Title VII hostile work environment claim, Patterson must establish four elements: (1) unwelcome harassment (2) "because of" her race or gender (3) that is "sufficiently severe or pervasive to create an abusive working environment," with (4) grounds for imputing liability to the employer. Smith v. First Union Nat'l Bank, 202 F.3d 234, 241 (4th Cir. 2000). I agree with the majority that Patterson has met the first element, that is, the conduct she complains of was unwelcome. In analyzing the remaining elements, however, we must keep in mind that Patterson's case is at the summary judgment stage. Accordingly, we are required to view the facts in the light most favorable to her. See Anderson v. Liberty Lobby, Inc. , 477 U.S. 242, 255 (1986). We also "draw all justifiable inferences in favor of [Patterson], including questions of credibility and of the weight to be accorded particular evidence." Masson v. New Yorker Magazine, Inc., 501 U.S. 496, 520 (1991). When the proffered evidence is treated in

9

this way, Patterson meets the remaining elements of a hostile work environment claim.

On the second element, I believe the majority errs in concluding that only seven incidents "appear to be germane to racial and gender animus." Ante at 6. To be sure, the following seven incidents identified by the majority are directly attributable to racial or gender animus:

(1) In late 1983 Officer McAndrew told Patterson,"Sheila, the problem with you is, you are oppressed. Black people are oppressed."

(2) In 1984 Officer McAndrew said to Patterson,"You have two strikes against you, you are Black and you are a female." When Patterson asked, "Why do you say that?", McAndrew responded, "Because that is the way it is around here."

(3) After Patterson failed to respond to a call at "Commonwealth ER" (a hospital) because she was mistakenly looking for the intersection of Commonwealth and ER streets, Officer Scherr yelled to her in a harsh tone, "[You're] a dumb bitch!"

(4) In February 1986 Patterson did not report to a high school to provide security for a wrestling match because she was delayed by heavy traffic due to a storm. Officer Jones reported to the school but learned that the match had been canceled because of the storm. When he arrived at the station and saw Patterson, he told her that she was not going to get overtime. The next day, Lt. Duckett signed her overtime slip. Shortly thereafter, Lt. Duckett and Officer Jones were playing pool in the dressing room. When Patterson asked to play, they refused to allow her in the game. Jones then said,"Women don't belong on this police department. This police department went to pot when women were hired on the department. All women do is bitch. They aren't nothing but a bunch of bitches. All they do is bitch. They don't belong on the department." Patterson alleges that Lt. Duckett did nothing except continue playing pool. Lt. Duckett later claimed that he was not present during the incident.

(5) Officer Larry Neidig states in an affidavit that between 1983 and 1989 several officers said to him that "Sheila Patterson is a dumb nigger."

10

(6) Officer Thaddeus Furlong, who is white and graduated first in his class from the police academy, reports in an affidavit that on one occasion before Patterson arrived at a roll call meeting, he heard Officer Baumker state, "we got to wait for Zulu to come in." Baumker was referring to Patterson.

(7) On at least two occasions, Officer Baumker called Patterson "cruiser butt" or "cruiser ass."

A reasonable jury could attribute at least five more events or situations to racial or gender animus. We have said that"[a]n employee is harassed or otherwise discriminated against `because of' his or her sex if, `but-for' the employee's sex, he or she would not have been the victim of the discrimination." Wrightson v. Pizza Hut of America, Inc., 99 F.3d 138, 142 (4th Cir. 1996). A reasonable jury would have at least two grounds for finding that additional events would not have occurred "but for" Patterson's race or gender. First, when viewed in conjunction with the seven incidents discussed above, these additional events could be viewed as part of an overall pattern of discrimination. See, e.g., Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1083 (3d Cir. 1996). Second, because no white or male officers in the department were treated in the same way, it would be reasonable to infer that Patterson would not have been the victim of these other incidents but for her race or gender. See, e.g. , Van Steenburgh v. Rival Co., 171 F.3d 1155, 1159 (8th Cir. 1999). Consequently, at the summary judgment stage, the following five incidents or situations should also be considered as attributable to racial or gender animus:

(1) While stationed in the West Springfield District from 1983 to 1987, Patterson reports that she frequently did not receive backup support when she asked for it. When she would ask for backup, the other officers often responded that they were busy. She also stated, "After an officer refused over the radio, my fellow patrol officers would click rapidly in unison on their hand microphones as a way to mock me."

(2) On several occasions in 1984 Patterson's field training officer, Officer Petracca, rolled down his cruiser window and sprayed mace so that it flew directly into Patterson's face. Officer Petracca also sprayed mace on Patterson's roll call chair in front of other officers.

11

Patterson declares that Petracca's conduct "was far worse than he exhibited towards other white, male officers."

(3) While in the locker room in 1985, Officer McAndrew said, "Hey, Sheila, why don't you come over here and shine my shoes," and then he began to laugh. Patterson viewed the remark as a continuation of McAndrew's earlier comments disparaging her race and gender.

(4) In September 1986 Patterson was questioning a juvenile while Sergeant Settlemeyer was present. Settlemeyer claims that Patterson hit the juvenile on the leg with a flashlight, and Patterson admits to "nudging" the juvenile. Lt. Duckett and Sgt. Settlemeyer orally reprimanded Patterson. Patterson filed a grievance as a result of the reprimand. No one from the department ever contacted the juvenile's parents to investigate the incident. Patterson offers a letter and an affidavit from the parents. They say that Patterson "displayed an exemplary professional demeanor" at all times and that "she also displayed human sensitivity and personal concern" for the juvenile and his parents.

(5) Monica Fenton, a resident of Fairfax County, declares that on March 23, 1987, her neighbors had called the police about another neighbor. Patterson responded first to the call. Later, four male police officers arrived. Fenton overheard "Sgt. Settlemeyer tell the people inside to calm down and if you would come down and file a complaint against this lady police officer (referring to Sheila Patterson), we can get her put off the force because we already have it set up." Fenton thought that the officers "were more interested in getting the young man to make a complaint against Ms. Patterson than in taking him into custody and enforcing the law."

These twelve matters -- the seven recognized by the majority plus the additional five -- enable Patterson to meet the second element of her hostile work environment claim. Patterson, in other words, has proffered sufficient evidence to establish that she was harassed because of her race or gender.[1]

_____

[1] Patterson complained to superiors about several of the twelve events. In certain cases the department took some action, and in some cases Patterson claims that the department did not take any remedial action at all. In any event, there is a material issue whether the department took adequate and effective remedial steps. See infra .

12

In evaluating the third element, whether the incidents are sufficiently severe or pervasive, the Supreme Court instructs us to examine "all the circumstances," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993). The majority says that because we are only talking about seven incidents (twelve or more by my count) occurring over a seven-year period, they "fall short of the consistent abhorrent conduct prohibited by the statute." Ante at 8. I disagree and would not discount the incidents on grounds of infrequency. First, Patterson forecasts evidence of several situations that involved both repeated and frequent harassment: Officer McAndrew made harassing and demeaning comments on at least three occasions; Officer Baumker called Patterson"cruiser butt" or "cruiser ass" at least two times; Officer Petracca sprayed mace at Patterson on several occasions; and Patterson reports that (between 1983 and 1987) she often did not receive the backup support she needed.

In any event, the frequency of the conduct is only one factor in the analysis of the third element (severity or pervasiveness). While we noted in Hopkins v. Baltimore Gas & Electric Company, 77 F.3d 745, 753 (4th Cir. 1996), that a series of intermittent incidents spread over seven years suggested a weak claim, we did not end our analysis there. Instead, we went on to conclude that the plaintiff's claim also failed because the alleged conduct "was sexually neutral or, at most, ambiguous" and because many of the events occurred in group settings where it was unclear that the comments were directed specifically at the plaintiff. Id. at 753-54. In contrast, Patterson raises a number of incidents that were overtly racial or sexual in nature. It was also clear that comments made in group settings were directed specifically at Patterson. Finally, the events involving the mace and the failure to provide Patterson with backup support showed that her fellow officers also placed her in physically threatening circumstances.

Patterson has also proffered enough evidence to meet the subjective component of the third element. To meet this component, Patterson need only forecast enough evidence to create a factual issue over whether she perceived her work environment to be abusive. See Harris, 510 U.S. at 21-22. Regardless of whether Patterson may have

13

occasionally used a derogatory term herself, see ante at 8, she has indicated, through her own account of the events in question, that she considered her own working conditions to be abusive and at times threatening.

Analysis of the fourth element (imputation of liability to the employer) depends on whether the actor was a co-worker or a supervisor. In co-worker harassment cases, an employer is liable if it had notice and failed to take prompt remedial action. See Spicer v. Commonwealth, 66 F.3d 705, 710 (4th Cir. 1995). Patterson has alleged a number of instances in which she gave her employer notice of co-worker harassment. Whether the county met its burden to take remedial action depends on whether the action was prompt, effectual, and adequate. See id. Based on Patterson's evidence, a reasonable jury could find that the county's response was ineffective in several instances. After Patterson notified her supervisors about Officer McAndrew's offensive remarks, they took no corrective action, and thereafter McAndrew demeaned Patterson still another time. Even though Officer Jones explicitly stated that women did not belong in the department, Internal Affairs decided to take no action about the remark. Patterson also declares that her supervisors did nothing to respond to her complaints regarding the lack of backup support. Finally, it is questionable whether an oral reprimand was an adequate and effectual response to the grossly offensive comments made by Officer Baumker. Based on this evidence, a jury could impute liability to the county on Patterson's claim of co-worker harassment.

Patterson also asserts several incidents of supervisor misconduct. (Officer Petracca, Sergeant Settlemeyer, and Lieutenant Duckett were all her supervisors.) In the sexual harassment cases of Faragher v. City of Boca Raton, 524 U.S. 775 (1998), and Burlington Industries, Inc. v. Ellerth, 524 U.S. 742 (1998), the Supreme Court announced a new standard for analyzing employer liability for supervisor misconduct. Although our court has yet to apply this standard to race-based harassment claims, other circuits have done so. See Allen v. Michigan Dep't of Corrections, 165 F.3d 405, 411-12 (6th Cir. 1999) (and cases cited therein). I would apply the Faragher-Ellerth standard to Patterson's claims of supervisor misconduct. Under Faragher and Ellerth, if the employer has not taken a tangible employment action (and none was taken against Patterson), the "defending employer may

14

raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence." Ellerth , 524 U.S. at 765. The affirmative defense "comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any . . . harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." Id.; Faragher, 524 U.S. at 807. Whether an employer has adopted "an effective anti-harassment policy is an important factor" in analyzing the first prong of the affirmative defense. Smith, 202 F.3d at 244. We have held "that any anti-harassment policy an employer adopts must be `both reasonably designed and reasonably effectual.'" Id. (quoting Brown v. Perry, 184 F.3d 388, 396 (4th Cir. 1999)). On the record before us, an issue of fact exists over whether the county's anti-harassment policy was "reasonably designed" and "reasonably effectual." Patterson asserts that she lodged verbal complaints about Officer Petracca's conduct (spraying mace), but nothing was done. When Patterson filed her grievance regarding the oral reprimand (from Sgt. Settlemeyer and Lt. Duckett) for the juvenile incident, no one from the department contacted the juvenile's parents to investigate. As a result, there is a basis for a reasonable jury to find for Patterson on the issue of employer liability for supervisor harassment.

Patterson has produced enough evidence to establish a genuine issue of material fact on her Title VII hostile work environment claim. Accordingly, I would reverse the district court's award of summary judgment to the county. Because I believe that Patterson is entitled to a trial, I respectfully dissent.

15