# In the

# United States Court of Appeals

## For the Seventh Circuit

No. 00-3598

TRUSTEES OF THE AFTRA HEALTH FUND,

*Plaintiff-Appellee,*

v.

RICHARD BIONDI,

*Third-Party Plaintiff-*
*Defendant-Appellant,*

v.

THOMAS C. O'BRIEN, SELMA D'SOUZA,
O'BRIEN & BARBAHEN, A PARTNERSHIP, et al.,

*Third-Party Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 99 C 1286—**Matthew F. Kennelly**, *Judge.*

ARGUED JANUARY 18, 2002—DECIDED SEPTEMBER 6, 2002

Before MANION, ROVNER, and EVANS, *Circuit Judges.*

MANION, *Circuit Judge.* In 1993, Richard and Hazel Biondi decided to end their marriage of thirty years. In doing so, the Biondis entered into a divorce decree which required Richard to pay COBRA health insurance premiums on behalf of Hazel for two years. Instead, and without no-

tifying his employer of the divorce, Richard allowed Hazel to remain listed under the existing medical plan as his spouse for a period of approximately five years. During that time, Hazel incurred substantial medical expenses. Upon learning of this ruse, the Trustees of the American Federation of Television and Radio Artists ("AFTRA") Health Fund filed suit against Richard Biondi, pursuant to Employee Retirement Income Security Act ("ERISA") and state common law fraud principles, seeking to recover monies paid to Hazel's medical providers after she became ineligible to receive dependent care health insurance benefits. Biondi, in turn, filed a third-party complaint against his former divorce attorneys and their law firms, alleging that their malpractice caused the damages sought in the Trustees' complaint, and contending that they were required to indemnify him for any judgment obtained against him and for the cost of defending the suit. The district court dismissed the Trustees' ERISA claim but entered judgment in their favor on the common law fraud claim. The district court also granted the third-party defendants summary judgment on Biondi's malpractice claim. Biondi filed a timely Rule 59(e) motion to alter or amend the district court's judgment, which the court denied. Biondi appeals the district court's entry of judgment against him on the Trustees' common law fraud claim, the court's decision to grant the third-party defendants' motion for summary judgment on his malpractice claim, and the denial of his Rule 59(e) motion. The Trustees do not appeal the district court's dismissal of their ERISA claim. We affirm.

## I.

In 1992, Richard Biondi hired the law firm of O'Brien & Barbahen to represent him in divorce proceedings initiated by his wife, Hazel, in a New Mexico state court. On March

30, 1993, the state court rendered a judgment expressly incorporating a Marital Settlement Agreement ("Settlement Agreement") entered into by the parties. The Settlement Agreement provided that Hazel "would have continued medical insurance coverage through [Biondi's] medical insurance company pursuant to COBRA," and that "[Biondi] shall pay the medical insurance premiums for [Hazel] for a period of twenty-four (24) months after the filing of the Final Decree in this matter." At all times relevant to this lawsuit, Biondi was an AFTRA employee and thus a plan "participant," as defined by 29 U.S.C. § 1002(7), in the AFTRA Health Fund ("Fund"). The Fund is an "employee welfare benefit plan" ("Plan"), as defined in 29 U.S.C. § 1002(3), that provides medical, hospital, and other welfare benefits to employees covered by collective bargaining agreements between employers and AFTRA. The Plan is established and maintained according to the Agreement and Declaration of Trust of the AFTRA Health and Retirement Funds ("Trust Agreement"). Provisions of the Plan are published in the Fund's Summary Plan Description ("Summary Plan") in accordance with 29 U.S.C. § 1022.[1]

Before their divorce, Hazel was a covered "beneficiary," as defined by 29 U.S.C. § 1002(8), under the Plan. The insurance premiums for that coverage were paid directly by Biondi's employer. After the divorce, Hazel was no longer eligible for dependent care coverage under the terms of the Plan. The Trust Agreement, Plan, and Summary Plan all emphasize that a "lawful" or "legal" spouse is covered by the Plan. The Summary Plan provides that

---

[1] According to the Trustees, copies of the Summary Plan were distributed periodically to all Plan participants, including Biondi, during the time period at issue in this case.

"[i]f you gain or lose a dependent by reason of marriage, *divorce*, birth, death or otherwise, you must so advise the nearest Fund office promptly. *It is particularly important that you contact the Fund office as soon as possible if you marry or divorce.*" (Emphasis added.)[2] Although no longer a dependent, Hazel was eligible for COBRA coverage, *see* 29 U.S.C. § 1161 *et seq.* Biondi did not, however, obtain this coverage for her as required by the divorce decree. Biondi also did not advise the Fund of his divorce, as required, until December 1997, when one of his former attorneys, Thomas C. O'Brien, sent a letter to the Fund advising it of the divorce and conveying an offer by Biondi to retroactively pay COBRA conversion premiums for the five-year period that Hazel received dependent care coverage under the Plan. In the letter, O'Brien noted that "[since] the requirement that Mrs. Biondi's coverage after the divorce judgment be pursuant to a COBRA or conversion plan was not brought to Mr. Biondi's attention, *he simply left his union benefits in place and treated her as a spouse*, believing that this was the proper way to discharge his liabilities under the divorce judgment." (Emphasis added.) Shortly after receiving this correspondence, the Fund terminated Hazel's dependent care coverage under the Plan, fifty-seven months after her divorce from Biondi. During this time period, the Fund made medical payments on Hazel's behalf to the tune of $122,792.86.

On July 17, 1998, the Trustees of the Fund filed a complaint against Biondi and Hazel in the United States District Court for the Southern District of New York, seeking a declaratory judgment for equitable relief under the Employee Retirement Income Security Act ("ERISA"), i.e.,

---

[2]   From this point forward, we will refer to the Trust Agreement, Plan, and Summary Plan collectively as the "Plan."

29 U.S.C. § 1132(a)(3)(B)(i), and damages for common law fraud. Specifically, the Trustees sought to recover $122,792.86 paid by the Fund on Hazel's post-divorce medical claims, as well as applicable interest, attorneys' fees, costs of litigation, and $50,000 in punitive damages. The Trustees' complaint alleged that Biondi intentionally failed to notify the Fund of his divorce, and misrepresented to the Fund that he was still married to his ex-wife, in order to cause the Fund to continue to provide Hazel with dependent care coverage and benefits. The Trustees subsequently amended their complaint to dismiss Hazel from the suit.

On February, 2, 1999, the Trustees filed a motion requesting the district court to transfer the action to the United States District Court for the Northern District of Illinois, which the court granted on February 17, 1999. On March 10, 1999, Richard Biondi filed a third-party complaint against Thomas C. O'Brien, Selma D'Souza, O'Brien & Barbahen ("third-party defendants"),[3] alleging that they committed legal malpractice in their representation of him during his divorce proceedings. He also sought indemnification from them for any judgment the Trustees might obtain against him, as well as reimbursement of all expenses and attorneys' fees incurred in his defense of the Trustees' claim. Biondi's legal malpractice claim is premised on the attorneys' collective failure to advise him of the Plan's requirements to notify it of the change in his marital status and request COBRA coverage for his ex-wife.

---

[3] Biondi also named Thomas O'Brien's then-current law firm, Gagliardi, Nelson & O'Brien ("GN&B"), as a defendant in the third-party complaint. However, on March 27, 2000, Biondi and GN&B entered into a "Tolling Agreement," after which time Biondi took no further action to prosecute his third-party claim against GN&B.

On April 13, 2000, after conducting a bench trial, the district court, relying on *Mertens v. Hewitt Assoc.*, 508 U.S. 248 (1993), dismissed the Trustees' declaratory action for restitution under ERISA, holding that: (1) 29 U.S.C. § 1132(a)(3)(B)(i) only provides plan administrators and fiduciaries with a remedy for equitable, not legal, relief against nonfiduciaries like Biondi; and (2) the Trustees could not obtain equitable relief against Biondi under § 1132(a)(3)(B)(i) because Biondi did not directly receive any of the payments that the Fund made on his ex-wife's behalf. The district court did, however, rule in the Trustees' favor on their common law fraud claim, rejecting Biondi's argument that ERISA expressly preempted the claim. The court found that on February 21, 1997, Biondi "knowingly made a false statement to the Fund [on a claims form] that Hazel was his wife . . . in order to claim medical benefits on her behalf with knowledge that the Fund would rely on that statement." At trial, Biondi denied that he had filled out the claims form, but the district court concluded that the handwriting on the form was his and that the Fund relied on this misrepresentation in paying the claim. The district court also found that Biondi fraudulently concealed his divorce from the Fund and that he failed to disclose this fact "knowingly and with the intent that the Fund would rely upon the omission, in other words, that it would continue to believe that she was his wife and provide her with medical coverage." The district court reached this conclusion in large part because of his former attorney's December 22, 1997, correspondence, wherein he indicated that Biondi made a conscious decision to "treat [Hazel] as his spouse" for purposes of insurance coverage. The court surmised that this admission demonstrated that "whether or not Mr. Biondi was aware of a specific obligation to tell the Fund of the divorce, he did have some level of knowledge and

awareness that this status made some difference." The court also found Biondi's decision not to "put his new wife on the insurance policy" relevant. Finally, the court concluded that Biondi's fraudulent misrepresentation on the February 21, 1997 claims form "provides further confirmation that he acted knowingly in failing to advise the Fund of the divorce even if that statement by itself did not influence all of the claims in this case." The district court delayed entering judgment on the Trustees' fraud claim, however, to give the parties time to enter into a stipulation regarding the measure of the Trustees' damages for Biondi's fraud.[4]

In light of this ruling, on May 25, 2000, the third-party defendants filed a motion for summary judgment of Biondi's malpractice claim, which the district court granted on August 4, 2000, holding that "[e]ven if Biondi's lawyers were negligent and committed malpractice as he contends, Biondi cannot seek to hold them responsible for the damages he has to pay as a result of his fraud." On August 9, 2000, the district court entered judgment against Biondi and in favor of the Trustees on their common law

---

[4] The district court held that from the time of the divorce through March 31, 1996, i.e., the COBRA coverage period, the Trustees' damages for Biondi's fraud were "the difference between the premium being paid by [his] employer and the premium that would have been owed for COBRA coverage, a total of $170 per month, for a grand total of $6,210." From April 1, 1996, until the time Hazel's dependent care coverage was terminated, the district court held that "the Fund's damages consist of the amounts that it paid out for her medical expenses for the services rendered . . . ." In a letter to the court, the parties stipulated that "the amount payable by Mr. Biondi pursuant to the formula set out in Your Honor's . . . Findings of Fact and Conclusions of Law is $118,006.70 [i.e., $111,796.70 for the post-COBRA coverage time period]."

fraud claim, awarding them $118,006.70, and in favor of the third-party defendants on Biondi's third-party complaint.[5] Biondi filed a timely motion to alter or amend the judgment, pursuant to Fed. R. Civ. P. 59(e), which the district court denied. Biondi appeals the district court's judgment and its denial of his Rule 59(e) motion.

## II.

On appeal, Biondi argues that the district court's judgment against him on the Trustees' common law fraud claim must be reversed because the claim is expressly preempted by ERISA. A district court's preemption ruling is a question of law that we review *de novo. See, e.g., Moran v. Rush Prudential HMO, Inc.*, 230 F.3d 959, 966 (7th Cir. 2000), *aff'd by* 122 S.Ct. 2151 (2002). Biondi also contends that the district court erred when it granted the third-party defen-

---

[5] The district court also mistakenly granted summary judgment on behalf of the law firm of Gagliardi, Nelson & O'Brien ("GN&B"), notwithstanding its tolling agreement with Biondi. *See supra* n. 3. The district court's inclusion of GN&B in its August 9, 2000 judgment appears to have been a clerical error. As such, Biondi had the right, under Fed. R. Civ. P 60(a), to request that the error be corrected during the pendency of this appeal. He failed to do so, however, and, by all accounts, appears to have abandoned his claim against GN&B. Biondi made no mention of the error in his Rule 59(e) motion, and, on appeal, he seems content to treat the district court's mistake as a *de facto* dismissal of GN&B from the lawsuit. In his initial appellate brief, Biondi emphasizes that he "took no further action to prosecute his third-party claim against [GN&B]," and that "no *formal* order of dismissal was entered in connection with [GN&B]." Given the foregoing, we decline to correct the error *sua sponte*.

dants' motion for summary judgment of his legal malpractice claim. We review a district court's decision to grant a motion for summary judgment *de novo*, construing all facts, and drawing all reasonable inferences from those facts, in favor of Biondi, the nonmoving party. *See, e.g., Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 326 (7th Cir. 2002). Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Finally, Biondi challenges the district court's denial of his Rule 59(e) motion to alter or amend its judgment, which we review under an abuse of discretion standard. *See, e.g., Zivitz v. Greenburg*, 279 F.3d 536, 539 (7th Cir. 2002).

### A. The Trustees' Common Law Fraud Claim and 29 U.S.C. § 1144(a)

Biondi argues that the district court erred in entering judgment against him on the Trustees' common law fraud claim because the claim is expressly preempted under ERISA's preemption clause, 29 U.S.C. § 1144(a), which provides, with certain exceptions not relevant here, that ERISA "shall supersede any and all State laws insofar as they may now or hereafter *relate to any employee benefit plan*."[6] *Id.* (emphasis added). The critical statutory phrase—

---

[6] Section 1144(a) is supplemented by two statutory definitions. The first broadly defines "State Law" as including "all laws, decisions, rules, regulations, or other State action having the effect of law," 29 U.S.C. § 1144(c)(1), and the second defines

(continued...)

"relate to any employee benefit plan"—is not, however, self-defining, and the Supreme Court "[has] been at least mildly schizophrenic in mapping its contours." *Carpenters Local Union No. 26 v. U.S. Fid. & Guar. Co.*, 215 F.3d 136, 139 (1st Cir. 2000). *See also Dishman v. UNUM Life Ins. Co. of Am.*, 269 F.3d 974, 980 (9th Cir. 2001) (noting that " '[d]eveloping a rule to identify whether ERISA pre-empts a given state law . . . has bedeviled the Supreme Court.' ") (citation omitted). As such, before delving into the murky waters of ERISA preemption, a brief summary of the Court's recent jurisprudence in this area is helpful.

The Supreme Court's early ERISA preemption cases glossed over the "relate to" text of § 1144(a) by portraying the phrase as deliberately expansive. *See, e.g., Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 45-46 (1987). In recent years, however, the Court has taken a more restrictive view of § 1144(a). The tide began to turn in this direction with the seminal decision of *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Insurance Co.*, 514 U.S. 645 (1995), where the Court emphasized that:

> Our past cases have recognized that the Supremacy Clause, U.S. Const., Art. VI, may entail pre-emption of state law either by express provision, by implica-tion, or by a conflict between federal and state law. And yet, despite the variety of these opportunities for federal pre-emption, we have never assumed lightly that Congress has derogated state regulation, but instead have addressed claims of pre-emption with

---

[6] (...continued)
an "employee benefit plan" as "an employee welfare benefit plan or an employee pension benefit plan or a plan which is both an employee welfare benefit plan and an employee pen-sion plan." 29 U.S.C. § 1002(3).

the starting presumption that Congress does not intend to supplant state law. Indeed, in cases like this one, where federal law is said to bar state action in fields of traditional state regulation, we have worked on the "assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress."

*Id.* at 654-55 (internal citations and citation omitted).

Additionally, the *Travelers* Court noted that because pre-emption claims turn on congressional intent, it is necessary, as with any exercise of statutory construction, to begin "with the text of the provision in question, and move on, as need be, to the structure and purpose of the Act . . . ." *Travelers*, 514 U.S. at 655. In addressing the "clearly expansive" text of § 1144(a), the Court concluded that if the statute's "words of limitation"—i.e., "relate to"—"were taken to extend to the furthest stretch of its indeterminacy, then for all practical purposes pre-emption would never run its course, for 'really, universally, relations stop nowhere.'" *Id.* (citation omitted). The Court also noted that its prior attempt to place some meat on § 1144(a)'s bare bones in *Shaw v. Delta Airlines, Inc.*, 463 U.S. 85 (1983), where it held that "[a] law 'relates to' an employee benefit plan, in the normal sense of the phrase, if it has a ***connection with or reference to*** such a plan," *id.* at 96-97 (emphasis added), was of limited utility because "an uncritical literalism [of the phrase "connection with"] is no more help than in trying to construe 'relate to' . . . [f]or the same reasons that infinite relations cannot be the measure of pre-emption, neither can infinite connections." *Travelers*, 514 U.S. at 656. For this reason, the Court in *Travelers* decided to add another layer to its ERISA preemption analysis, holding that, for purposes of § 1144(a), a federal

court's evaluation of a state law's relation to an employee benefit plan must "go beyond the unhelpful text and the frustrating difficulty of defining its key term, and *look instead to the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive.*" *Id.* (emphasis added). The Court amended the "objectives" principle from *Travelers* slightly in *California Division of Labor Standards Enforcement v. Dillingham Construction, N.A., Inc.*, 519 U.S. 316 (1997), rephrasing it to stress that the objectives of ERISA are also to be used to determine the "nature of the effect of the state law on ERISA plans." *Id.* at 325. *See also De Buono v. NYSA-ILA Med. & Clinical Services Fund,* 520 U.S. 806, 813-14 (1997) (utilizing the "objectives" principle from *Travelers* and *Dillingham*); *Egelhoff v. Egelhoff,* 532 U.S. 141, 147 (2001) (same).

Cataloging ERISA's statutory objectives is a fairly straightforward exercise. ERISA's primary objectives are to "protect . . . the interests of participants . . . and their beneficiaries, by requiring the disclosure and reporting . . . of financial and other information . . . by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies, sanctions, and ready access to the Federal courts," 29 U.S.C. § 1001(b), and "by improving the equitable character and the soundness of such plans by requiring them to vest the accrued benefits of employees with significant periods of service, to meet minimum standards of funding, and by requiring plan termination insurance." 29 U.S.C. § 1001(c). Additionally, we know that when Congress enacted § 1144(a) it intended:

> to ensure that plans and plan sponsors would be subject to a uniform body of benefits law; the goal was to minimize the administrative and financial burden of complying with conflicting directives among States

or between States and the Federal Government . . ., [and to prevent] the potential for conflict in substantive law . . . requiring the tailoring of plans and employer conduct to the peculiarities of the law of each jurisdiction.

*Travelers*, 514 U.S. at 656-57 (citation omitted). *See also Darcangelo v. Verizon Communications, Inc.*, 292 F.3d 181, 190 (4th Cir. 2002) (noting that " '[t]he basic thrust of [ERISA's] preemption clause . . . was to avoid the multiplicity of regulation in order to permit the nationally uniform administration of employee benefit plans.' ") (citation omitted).

Under this rubric, the Supreme Court has identified at least three instances where a state law can be said to have a "connection with" or "reference to" employee benefit plans, when it (1) "mandate[s] employee benefit structures or their administration," *Travelers*, 514 U.S. at 658; (2) binds employers or plan administrators to particular choices or precludes uniform administrative practice, thereby functioning as a regulation of an ERISA plan itself, *id.* at 659-60; and (3) provides an alternative enforcement mechanism to ERISA. *Id.* at 658.

With the foregoing in mind, we now turn to Biondi's argument that the Trustees' state-law claim is expressly preempted by ERISA. As an initial matter, we note that because the Trustees' claim is for common law fraud, a traditional area of state regulation, Biondi bears "the considerable burden of overcoming 'the starting presumption that Congress does not intend to supplant state law.' " *De Buono*, 520 U.S. at 814 (citation omitted). *See also LeBlanc v. Cahill*, 153 F.3d 134, 147 (4th Cir. 1998) (applying presumption to common law fraud claim). However, we also recognize that the mere fact that States have traditionally regulated common law fraud does not, in and of itself, preclude the Trustees' claim from being expressly

preempted under § 1144(a), if allowing the claim to go forward would thwart the statutory objectives of ERISA. *See, e.g., Dillingham,* 519 U.S. at 330.

In this case, the Trustees, as Plan fiduciaries, *see* 29 U.S.C. § 1102, are seeking to recoup monies that the Fund improperly expended as a result of a plan participant's fraudulent conduct. Thus, far from thwarting ERISA's stated statutory objectives, the Trustees' common law fraud claim is an attempt to protect the financial integrity of the Fund, which is certainly in the Plan participants' and beneficiaries' best interests, as well as being consistent with the Trustees' fiduciary obligations under ERISA. *See generally* 29 U.S.C. §§ 1101-1114 (ERISA's fiduciary responsibility provisions). Furthermore, the Trustees' state-law fraud claim clearly does not subject plan administrators and plan sponsors to conflicting directives among States or between States and the federal government, or create a potential conflict in substantive law requiring the tailoring of plan and employer conduct to the peculiarities of the law of each state. In sum, the Trustees' claim does not threaten in any way Congress's goal of national uniformity in the administration of ERISA plans. Finally, by no stretch of the imagination can the Trustees' claim be said to mandate employee benefit structures or their administration, or bind plan administrators to particular choices or preclude uniform administrative practices. As such, the Trustees' claim "is quite remote from the areas with which ERISA is expressly concerned— 'reporting, disclosure, fiduciary responsibility, and the like.' " *Dillingham,* 519 U.S. at 330 (citation omitted).[7]

---

[7] Because, as discussed *infra,* the Trustees' fraud claim is largely premised on Biondi's failure to disclose his divorce to the

(continued...)

This leaves only the question of whether the Trustees are using a common law fraud claim as an alternative enforcement mechanism to ERISA's civil enforcement provisions, which are delineated in 29 U.S.C. § 1132(a). The Supreme Court has identified two categories of state laws that act as alternative enforcement mechanisms to ERISA. One is where "the existence of a pension plan is a critical element of a state-law cause of action," *De Buono*, 520 U.S. at 815, and the other is where a "state statute contains provisions that expressly refer to ERISA or ERISA plans . . . ." *Id.* The former is preempted under ERISA's express preemption statute, i.e., § 1144(a), and the latter is preempted under ERISA's field ("complete") preemption statute, i.e., 29 U.S.C. § 1132(a). Biondi maintains that the Trustees' fraud claim impermissibly "references" an ERISA plan, within the meaning of § 1144(a),[8] because

---

[7] (...continued)

Fund, we pause to emphasize that ERISA's "disclosure" provisions only impose duties on plan administrators, employers, and fiduciaries, not plan participants. *See generally* 29 U.S.C. §§ 1021-1031.

[8] Both of the alternative enforcement mechanisms identified by the Supreme Court in *De Buono* also happen to be the two categories of state laws which the Court has found as making "reference to" ERISA plans. *See Dillingham*, 519 U.S. at 325 (holding that "[w]here a state law acts immediately and exclusively upon ERISA plans . . . or where the existence of ERISA plans is essential to the law's operation . . . that 'reference' will result in pre-emption."). We note in passing that the Supreme Court has yet to *explicitly* apply the "objectives" principle articulated in *Travelers* and *Dillingham* to a state law that makes "reference to," as opposed to merely having a "connection with," ERISA plans. *See Carpenters*, 215 F.3d at 143 (noting that the

(continued...)

"the existence of a pension plan is a critical element of [their] . . . state-law cause of action," *De Buono*, 520 U.S. at 815, and that but for the duties imposed upon him by the Plan "[his] conduct would not even have been actionable."[9]

At this point, it is important to emphasize that the Trustees' claim encompasses two separate and distinct forms of common law fraud, fraudulent misrepresentation and

---

[8] (...continued)
Supreme Court's decisions in *Travelers* and *Dillingham* "stop short of explicitly endorsing a new analytic modality for the 'reference to' inquiry."). Nevertheless, we join the First Circuit in concluding that when the nexus between a state law and ERISA is less than clear, federal courts are required to evaluate the law in light of ERISA's statutory objectives—regardless of which category of preemption the state law might fall under. *Id.* *See also Dishman*, 269 F.3d at 981 n.15 (noting that "the Supreme Court's recent [ERISA preemption] cases have eschewed . . . multi-factor tests in favor of a more holistic analysis guided by congressional intent."). Therefore, whether the Trustees' common law fraud claim is characterized as being one that has a "connection with" or "reference to" an ERISA plan, we believe that the nature of the Trustees' claim is such that an "objectives" analysis is clearly required to determine whether it is subject to preemption under § 1144(a).

[9] Biondi also argued in his initial appellate brief that the Trustees' claim was "completely" preempted under § 1132(a). Biondi, however, failed to make this argument before the district court, thereby waiving the right to argue the issue on appeal. *See, e.g.*, *Moulton v. Vigo County*, 150 F.3d 801, 803 (7th Cir. 1998). In any event, this waiver is of no consequence because, as we discuss *infra*, § 1132(a) does not provide the Trustees with a remedy that would enable them to recover damages for Biondi's fraudulent conduct.

fraudulent concealment. The district court found that Biondi fraudulently misrepresented his marital status to the Fund when he signed a claims form indicating that he was still married to his ex-wife "in order to claim medical benefits on her behalf with knowledge that the Fund would rely on that statement."[10] The district court also concluded that Biondi had a duty under Illinois tort law to disclose his divorce to the Fund and that his failure to do so constituted fraudulent concealment.

With respect to the Trustees' claim for fraudulent misrepresentation, Biondi's argument is a non-starter. Regardless of any contractual duties Biondi owed the Fund under the terms of the Plan, he had a separate and distinct duty under Illinois tort law not to misrepresent his marital status on the claims form he submitted to the Fund on February 21, 1997. *See, e.g.*, *Peter J. Hartmann Co. v. Capital Bank & Trust Co.*, 694 N.E.2d 1108, 1114 (Ill. App. Ct. 1998) (holding that "[f]raudulent misrepresentation claims do not require articulation of a duty to disclose as an element of the cause of action, because such claims are predicated on a more general moral obligation to speak the truth and not to deceive when an affirmative action is taken, such as a representation intended to initiate a response on the part of the reliant recipient."). However, while the district court found that the Fund relied on

---

[10] To prevail in a cause of action for fraudulent misrepresentation under Illinois law, a plaintiff must prove that "(1) the defendant intentionally made a false statement of a material fact; (2) the plaintiff had a right to rely on that false statement; (3) the statement was made for the purpose of inducing reliance thereon; (4) the plaintiff in fact relied on the statement; and (5) the plaintiff suffered injury as a direct result." *Rolando v. Pence*, 769 N.E.2d 1108, 1112-13 (Ill. App. Ct. 2002).

Biondi's misrepresentation as to that particular claim, it also concluded that there was no evidence that the Fund relied on this misrepresentation as to any other claim. The district court held that with respect to "the other claims in question, [the Fund] was relying on Mr. Biondi's failure to disclose that Hazel was no longer his wife and thus was not eligible for coverage." And this brings us to the heart of Biondi's argument on appeal.

Biondi maintains that the Trustees cannot prove that he fraudulently concealed his divorce from the Fund without referring to the Plan's provisions, and as such the claim is subject to preemption under § 1144(a). In order for a plaintiff to demonstrate fraudulent concealment under Illinois law, it must prove: (1) the concealment of a material fact; (2) that the concealment was intended to induce a false belief, under circumstances creating a duty to speak; (3) that the innocent party could not have discovered the truth through a reasonable inquiry or inspection, or was prevented from making a reasonable inquiry or inspection, and relied upon the silence as a representation that the fact did not exist; (4) that the concealed information was such that the injured party would have acted differently had he been aware of it; and (5) that reliance by the person from whom the fact was concealed led to his injury. *See, e.g., Schrager v. North Community Bank*, 767 N.E.2d 376, 384 (Ill. App. Ct. 2002). Biondi claims that the "concealment" portion of the Trustees' fraud claim constitutes an alternative enforcement mechanism to ERISA because the "circumstances creating a duty to speak" on his part, a critical element of proving fraudulent concealment, arose from the Plan provisions requiring him to disclose his divorce to the Fund.

In support of his argument, Biondi relies heavily on the Supreme Court's decision in *Ingersoll-Rand Co. v. Mc-*

*Clendon*, 498 U.S. 133 (1990), where the Court held that Texas's judicially created cause of action for the tort of wrongful discharge was expressly preempted by ERISA because "[t]he . . . cause of action makes specific reference to, and indeed is premised on, the existence of a pension plan." *Id.* at 140. There is, however, a key difference between the cause of action at issue in *Ingersoll-Rand* and the Trustees' claim against Biondi for fraudulent concealment. In *Ingersoll-Rand*, the Court held that the common law cause of action created by the Supreme Court of Texas was "specifically designed" to affect employee benefit plans because it only " 'allows recovery when the plaintiff proves that the principal reason for his termination was the employer's desire to avoid contributing to or paying benefits under the employee's pension fund.' " *Id.* (citation omitted). In contrast, Illinois's common law tort of fraudulent concealment, a traditional state-based law of general applicability, *see, e.g., LeBlanc*, 153 F.3d at 147-48, clearly makes no direct reference to ERISA plans nor relies on the existence of such plans to operate. This is an important distinction because in *Ingersoll-Rand* the Court specifically noted that it was "not dealing . . . with a generally applicable statute that makes no reference to, or indeed functions irrespective of, the existence of an ERISA plan." *Ingersoll-Rand*, 498 U.S. at 139. Thus, when the Supreme Court describes *Ingersoll-Rand* as a case "where the existence of a pension plan [was] a *critical element* of a state-law cause of action," *De Buono*, 520 U.S. at 815 (emphasis added), or one where "a common law cause of action [was] premised on the existence of an ERISA plan," *Dillingham*, 519 U.S. at 324-25, it is referring to a claim where the state law at issue relied, for its very operation, on a direct and unequivocal nexus with ERISA plans. *Id.* at 325 (holding that "where the existence of ERISA plans is essential to the law's operation, as in . . . *Ingersoll-*

*Rand*, that 'reference' will result in pre-emption."). *See also Smith v. Cohen Benefit Group, Inc.*, 851 F. Supp. 210, 213 (M.D. N.C. 1993) (holding that plaintiffs' claims for common law fraud, constructive fraud, and negligent misrepresentation were not preempted by § 1144(a) because, unlike the cause of action in *Ingersoll-Rand*, these claims involved "general laws that function irrespective of the existence of an ERISA plan.").

Biondi glosses over the holding of *Ingersoll-Rand*, focusing instead on the Court's observation in that case that "[u]nder [the] 'broad common sense meaning' [of *Shaw's* "connection with" or "reference to" definition] a state law may 'relate to' a benefit plan, and thereby be pre-empted, even if the law is not specifically designed to affect such plans, or the effect is only indirect." 498 U.S. at 139. Biondi, however, fails to place this language in its proper context. In noting that state laws may "relate to" an ERISA plan even when they are not specifically designed to affect them, the Court explicitly relied on its previous decisions in *Pilot Life Insurance Co. v. Dedeaux*, 481 U.S. 41 (1987), and *Alessi v. Raybestos-Manhattan, Inc.*, 451 U.S. 504 (1981), *id.*, neither of which involved claims similar to the one at issue in this case.

In *Pilot Life*, the Supreme Court held that a plan beneficiary's generally applicable state common law tort and contract actions were preempted under § 1144(a) because they were based on " alleged improper processing of a claim for benefits under an insured employee benefit plan . . . ." 481 U.S. at 48. In *Alessi*, the Court held that a group of retirees' claim against their former employer—for violating a New Jersey statute prohibiting workers' compensation benefits from being used to offset pension benefits—was expressly preempted under § 1144(a) because the statute "eliminates one method for calculating pension bene-

fits—integration—that is permitted by [ERISA]." 451 U.S. at 524. In both of these cases, and in *Ingersoll-Rand*, the Court was dealing with claims brought by plaintiffs for a wrongful denial of benefits under an ERISA plan—a fundamental concern of ERISA. *See Rush Prudential HMO, Inc. v. Moran*, 122 S.Ct. 2151, 2166 (2002) (noting that "Congress ha[s] so completely preempted the field of benefits law that an ostensibly state cause of action for benefits was necessarily a 'creature of federal law' removable to federal court."). Thus, even after *Travelers*, *Dillingham*, and *De Buono*—cases that dramatically altered the landscape of ERISA preemption jurisprudence—the Supreme Court's holdings in *Pilot Life* and *Alessi* remain viable because the state-law claims in those cases clearly "implicate[d] an area of core ERISA concern." *Egelhoff*, 532 U.S. at 147. On the other hand, as previously discussed, the Trustees' common law fraud claim does not implicate any of ERISA's fundamental concerns; the Plan is merely the context in which Biondi's fraudulent conduct occurred.

The Second Circuit came to this same conclusion in *Geller v. County Line Auto Sales, Inc.*, 86 F.3d 18 (2d Cir. 1996), where the court held—in addressing a claim virtually indistinguishable from the one at issue in this case—that a common law fraud claim brought by the trustees of a multi-employer ERISA plan against an employer and two of its officers was not preempted under § 1144(a). In that case, the trustees were seeking to recover damages resulting from the defendants falsely listing the girlfriend of an officer as a full-time employee in order to make her an eligible participant in the company's employee benefit plan. *Id.* at 20. The girlfriend subsequently incurred $104,554.82 in medical expenses, all of which were paid by the employee benefit trust fund. *Id.* After her passing, the trustees discovered that the officer's

girlfriend had never been employed with the defendant company and promptly demanded reimbursement for the medical benefits the trust fund paid on her behalf. *Id.* The defendants refused, and the trustees initiated an action against them seeking restitution under § 1132(a), and compensatory and punitive damages under New York common law fraud and restitution. *Id.* The district court found that the trustees could not prevail under ERISA's civil enforcement provisions because "first, as fiduciaries the plaintiffs were limited to equitable relief under . . . § 1132(a)(2) and the claim here was for money damages; second, the broad panoply of remedies available against fiduciaries under . . . § 1132(a)(3) was not available to the plaintiffs because the defendants were not fiduciaries." *Id.* The district court then held that the trustees' common law claims for fraud and restitution were preempted under § 1144(a). *Id.*

On appeal, the Second Circuit agreed with the district court that the trustees were unable to recover damages against the defendants under §§ 1132(a)(2) or (a)(3), *id.* at 20-22, and with the court's dismissal of the trustees' common law restitution claim "because restitution is accounted for in ERISA." *Id.* at 21. The Second Circuit disagreed, however, with the district court's conclusion that the trustees' common law fraud claim was preempted under § 1144(a), noting:

> We believe, however, that the plaintiffs' fraud claim may stand. ERISA is a remedial statute enacted to protect the interests of beneficiaries of private retirement plans by reducing the risk of loss of pension benefits. ERISA established a comprehensive federal statutory program intended to control abuses associated with pension benefit plans . . . . In this case, however, allowing the plaintiffs to pursue their common law

fraud claim would in no way compromise the pur-
pose of Congress and does not impede federal con-
trol over the regulation of employee benefit plans. To
the contrary, "insuring the honest administration of
financially sound plans" is critical to the accomplish-
ment of ERISA's mission. ERISA is designed to protect
the interests of participants and beneficiaries of em-
ployee benefit plans, and the preemption provision
should not be read to contravene the statute's underly-
ing design. The unauthorized diminution of pension
benefits—in the present case, the outright squander-
ing of funds—is squarely at odds with the congres-
sional purpose of protecting pension benefits. The
plaintiffs' common law fraud claim, which seeks to
advance the rights and expectations created by ERISA,
is not preempted simply because it may have a tangen-
tial impact on employee benefit plans . . . . The plain-
tiffs' fraud claim does not rely on the pension plan's
operation or management. The "bare bones" of the
complaint are that 1) the defendants fraudulently
misrepresented that [the officer's girlfriend] was a full-
time employee and 2) in reliance on the defen-
dants' representation, the plaintiffs paid out more
than $104,000 on her behalf. *The plan was only the
context in which this garden variety fraud occurred.*

*Id.* at 22-23 (internal citations omitted) (emphasis added).

Biondi attempts to distinguish *Geller* by arguing that "the
essence of the fraudulent conduct complained of in
*Geller*—an employer's misrepresentation to the plan's
administrator that a person was an employee when, in fact,
she never was—was a fraudulent act that did not rely on the
plan's operation or management," whereas in this case
"Biondi was a Plan participant within the meaning
of ERISA, and the fraud that the Trustees complain of . . .

is totally dependent on the Plan's requirement that participants notify the Fund of any change in marital status . . . ." This argument, however, strikes us as "smack[ing] of the 'uncritical literalism' the Supreme Court has admonished use to eschew." *Dishman*, 269 F.3d at 984. A state-law claim is not expressly preempted under § 1144(a) merely because it requires a cursory examination of ERISA plan provisions. *See, e.g., Coyne & Delany Co. v. Selman*, 98 F.3d 1457, 1472 (4th Cir. 1996). While we have held that ERISA "preempts a state law claim if the claim requires the court to interpret or apply the terms of an employee benefit plan," *see, e.g., Collins v. Ralston Purina Co.*, 147 F.3d 592, 595 (7th Cir. 1998), the Trustees' common law fraud claim does not require us to interpret or apply any of the Plan's provisions. *See, e.g., Central Laborers Welfare Fund v. Philip Morris, Inc.*, 85 F. Supp. 2d 875, 891 (S.D. Ill. 1998) (holding that trustees' claims, one of which was for common law fraud, could be resolved without an interpretation of the employee benefit plan where "[t]he meaning of the subrogation clause is not at issue . . . [and] the Plaintiffs are attempting to recover monies . . . expended for plan participants' or beneficiaries' health care . . . [not] monies on behalf of the plan participants or beneficiaries.").

In this case, neither party disputes the meaning of the Plan provision requiring Biondi to keep the Fund apprised of his marital status. In fact, the district court concluded that Biondi had fraudulently concealed his divorce from the Fund even though he "probably did not realize that there was a specific provision [requiring him to disclose this fact to the Fund]." Furthermore, under Illinois law, a duty under a contract may also create a separate and distinct duty under tort law. *See, e.g., Dial v. Mihalic*, 438 N.E.2d 546, 550-51 (Ill. App. Ct. 1982) (holding that non-lessee plaintiff had standing to sue lessor of land for breach of covenant to repair land "where the breach creates an un-

reasonable risk to persons upon the land which performance of the lessor's agreement would have prevented," and noting that in such a case "[t]he lessor's duty . . . 'is not merely contractual . . . It is a tort duty [and thus] . . . extends to persons on the land with the consent of the lessee, with whom the lessor has made no contract.' ") (quoting *Restatement (Second) of Torts* § 357 cmt. d (1965)). *See also Restatement (Second) of Torts* § 551(1) (1976)).[11] Therefore, to the extent the Plan's provisions are to be examined, it is only done to determine whether the Trustees' have established that Biondi had a duty under tort law not to conceal his divorce from the Fund. *See Coyne*, 98 F.3d at 1471-72 (holding that "[c]ommon law imposes the duty of care regardless of whether the malpractice involves an ERISA plan," and as such "the duty of care does not depend on ERISA in any way," because while "resolution of . . . [the] claim will require an examination of certain [plan] provisions . . . the court's inquiry will be centered on whether the defendants' conduct comported with the relevant professional standard of care . . . [and] on legal duties generated outside the ERISA context."). *See also Roach v. Mail Handlers Benefit Plan*, 298 F.3d 847, 851 (9th Cir. 2002); *Cohen Benefit Group*, 851 F. Supp. at 213. As such, we hold that a plan participant's decision to commit fraud in the context of an employee benefit plan does not immunize him from tort

---

[11] *Restatement (Second) of Torts* § 551(1) provides that "[o]ne who fails to disclose to another a fact that he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had represented the nonexistence of the matter that he has failed to disclose, if, but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in question."

liability under state law.[12] The Fourth Circuit came to a similar conclusion in *Darcangelo v. Verizon Communications, Inc.*, 292 F.3d 181 (4th Cir. 2002), holding that:

> [T]he simple fact that a defendant is an ERISA plan administrator does not automatically insulate it from state law liability for alleged wrongdoing against a plan participant or beneficiary . . . . The facts alleged in this case prompt us . . . to "doubt that Congress intended the category of fiduciary administrative functions to encompass" tortious conduct by a plan administrator that is completely unrelated to its duties under the plan [and this doubt] "hardens into conviction when we consider the consequences that would follow from [the defendants'] contrary view." *Under the*

---

[12] *See LeBlanc*, 153 F.3d at 148 (holding that "[t]he fact that the Pension Fund is subject to ERISA is of no consequence to its common law fraud claim . . . [because in bringing the claim] the Pension Fund is simply in the role of an investor allegedly wronged."); *Arizona State Carpenters Pension Trust Fund v. Citibank*, 125 F.3d 715, 723-24 (9th Cir. 1997) (holding that a pension trust fund's common law fraud claim was not an alternative enforcement mechanism to ERISA because the claim arose from "state law doctrines of general application," and noting that "[a]s a service provider offering nonfiduciary custodial services, Citibank's relationship with the Trust Funds was no different from that between Citibank and any of its customers."); *Morstein v. Nat'l Ins. Services*, 93 F.3d 715, 723 (11th Cir. 1996) (holding that a plan participant's common law fraud claim against insurance agents for "fraudulently inducing her to change benefit plan" was not expressly preempted by ERISA because, among other things, "[t]hese same agents currently face the threat of state tort claims if they make fraudulent representations to individuals and entities not governed by ERISA plans.").

> *defendants' view, ERISA administrators would enjoy blanket immunity—at least from damages under state tort law—for any manner of wrongful conduct aimed at plan participants and beneficiaries, regardless of how unrelated that conduct is to the ERISA plan.* We cannot imagine that Congress would have wanted such a result. As our court has explained, state common law torts such as invasion of privacy and negligence are traditional areas of state authority, and "[f]ederalism concerns strongly counsel against imputing to Congress an intent" to preempt large swaths of state law "absent some clearly expressed direction."

*Id.* at 192-94 (internal citations omitted) (emphasis added).

For these same reasons, we see no reason why a plan participant is entitled to "blanket immunity" from damages under state tort law simply because he chose to defraud an employee benefit trust fund. The Trustees were defrauded in the context of a contractual relationship, and as such they are entitled under Illinois law to sue in tort to recover damages for that fraud. *See, e.g., In Re Chicago Flood Litigation*, 680 N.E.2d 265, 275 (Ill. 1997). The Trustees' common law fraud claim is the same type of "run-of-the-mill" state-law tort claim that the Supreme Court identified in *Mackey v. Lanier Collection Agency & Service, Inc.*, 486 U.S. 825 (1988), as being outside the scope of ERISA's preemption clause. *Id.* at 833. Thus, while the Trustees' claim obviously "relates to" the Plan at some level, the Supreme Court has made it clear that federal courts are to go "beyond the unhelpful text" of § 1144(a) and evaluate preemption challenges in light of ERISA's overall "objectives." *See Travelers*, 514 U.S. at 656.

We, therefore, find the Second Circuit's reasoning in *Geller* persuasive and consistent with the ERISA preemption

principles articulated by the Supreme Court in *Travelers* and its progeny. Accordingly, like the Second Circuit, we conclude that it would be improper "to hold pre-empted a state law in an area of traditional state regulation based on so tenuous a relation without doing grave violence to our presumption that Congress intended nothing of the sort." *Dillingham*, 519 U.S. at 334. It would, in our opinion, elevate "uncritical literalism" to a new level to characterize the Trustees' common law fraud claim as an "alternative enforcement mechanism" of ERISA when ERISA's civil enforcement provisions, i.e., § 1132(a)(1)-(9), neither address nor provide a remedy for situations where a employee benefit trust fund has been defrauded by a non-fiduciary. *See* 29 U.S.C. §§ 1109, 1132(a)(1)(2), 1132(d)(2). *See also Jass v. Prudential Health Care Plan, Inc.*, 88 F.3d 1482, 1490 (7th Cir. 1996) (holding that § 1132(a) only permits suits for legal relief against ERISA plans, administrators, or fiduciaries). Because ERISA does not provide *any* mechanism for plan administrators or fiduciaries to recoup monies defrauded from employee benefit trust funds by plan participants, garden-variety state-law tort claims must, as a general matter, remain undisturbed by ERISA; otherwise, there would be no way for a trust fund to recover damages caused by a plan participant's fraudulent conduct. *See Mackey*, 486 U.S. at 834 (where the Supreme Court made a similar conclusion regarding a plan participant's right to use "state-law methods for collecting money judgments.").

For all of the foregoing reasons, we conclude that the district court was not precluded from entering judgment in favor of the Trustees on their common law fraud claim, and that the court did not abuse its discretion in denying Biondi's Rule 59(e) motion regarding same.

### B. Biondi's Malpractice Claim Against His Former Attorneys

Biondi also argues that the district court erred in granting the third-party defendants' motion for summary judgment of his malpractice claim. In a nutshell, Biondi contends that the third-party defendants should be required to indemnify him for any monies that he is required to pay the Trustees because but for their malpractice he would not have committed fraud. Specifically, Biondi claims that the third-party defendants were negligent in their representation of him during his divorce proceedings because: (1) they failed to advise the Plan directly of Biondi's divorce and his need to obtain COBRA benefits for his ex-wife; or (2) they did not advise Biondi of the need for him to give notice of his divorce to the Plan and request COBRA benefits for his ex-wife. Biondi maintains that had the third-party defendants taken either of these actions "any possibility of the kind of fraud that occurred would have been impossible."

In granting the third-party defendants' motion for summary judgment, the district court rejected this argument, holding that "[e]ven if Biondi's lawyers were negligent and committed malpractice as he contends, Biondi cannot seek to hold them responsible for the damages he has to pay as a result of his fraud." We agree. While neither party has cited authority directly on point, the general rule is that Illinois courts "will not aid a fraudfeasor who invokes the court's jurisdiction to relieve him of the consequences of his fraud." *Goldstein v. Lustig*, 507 N.E.2d 164, 170 (Ill. App. Ct. 1987). "This refusal to aid derives not from the consideration of the defendant, but from a desire to see that those who transgress the moral or criminal code shall not receive aid from the judicial branch of government." *Mettes v. Quinn*, 411 N.E.2d 549, 551 (Ill. App. Ct.

1980). Furthermore, Illinois tort law, which both parties agree applies in this case, distinguishes between conditions and causes; when one party's negligence simply furnishes a condition by which an injury is made possible, and that condition leads to an injury due to the later independent act of another party, the creation of the condition is held not to be the proximate cause of the injury. *See, e.g., First Springfield Bank & Trust v. Galman*, 720 N.E.2d 1068, 1071 (Ill App. Ct. 1999). We, therefore, conclude that the district court was correct in granting the third-party defendants' motion for summary judgment, and in denying Biondi's Rule 59(e) motion to alter or amend its judgment as well.

## III.

The Trustees' common law fraud claim is not preempted by § 1144(a). Accordingly, the district court did not commit error by entering judgment against Biondi and in the Trustees' favor on the claim. Furthermore, the district court properly granted the third-party defendants summary judgment of Biondi's malpractice claim because under Illinois law a fraudfeasor may not hold others liable for damages he incurs as a result of his own fraudulent conduct. For these same reasons, we conclude that the district court did not abuse its discretion in denying Biondi's Rule 59(e) motion to alter or amend its judgment. The district court's judgment is AFFIRMED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*